**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **MICHAEL A. KEETON, individually** | § | |
| **and on behalf of all others** | § | |
| **similarly situated,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 1:14-cv-00130** |
| | § | |
| **TATE & KIRLIN ASSOCIATES;** | § | |
| **LVNV FUNDING; and JOHN &** | § | |
| **JANE DOES NOS. 1 THROUGH 25** | § | |
| | § | |
| **Defendants.** | § | |

**APPENDIX TO DEFENDANT LVNV FUNDING, LLC'S
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF**

Defendant LVNV Funding, LLC, files this its Appendix to it Motion for Summary Judgment and Brief in Support Thereof.

Rule 7 of the Court's Civil Rules requests that an appendix be provided containing cases if the authorities are not found in specified sources. The case that are not included in the described sources are attached hereto.

## TABLE OF CONTENTS

### Southwestern Reporter

1. *Fievel v. Zuber*, 3 S.W. 273, 274 (Tex. 1887)

### Unpublished Opinions

2. *Buchanan v. Northland Group, Inc.*, 2013 U.S. Dist. LEXIS 187737 (S.D. Mich. 2013)

3. *Jenkins v. RJM Acquisitions, LLC*, Civil Action No. 5:10CV27-RLV, 2013 U.S. Dist. LEXIS 20133, 2013 WL 589006 (W.D.N.C. Feb. 14, 2013)

4. *Johnson v. Capital One Bank*, 2000 U.S. Dist. LEXIS 13311 (W.D. Tex. 2000)

5. *Mavilla v. Absolute Collection Serv., Inc.*, No. 5:10-CV-412-F, 2013 U.S. Dist. LEXIS 3925, 2013 WL 140046 (E.D.N.C. Jan. 10, 2013)

6. *Price v. M.R.S. Associates,* 2014 U.S. Dist. LEXIS 87803 (E.D. N.C. 2014)

7. *Reed v. AFNI, Inc.*, No. 2:09-CV-459 TS, 2011 U.S. Dist. LEXIS 3600, 2011 WL 112430, (D. Utah Jan. 13, 2011)

8. *Schaefer v. Asset Acceptance, LLC,* 2011 U.S. Dist. LEXIS 77828 (D. Mass. 2011)

## *Fievel v. Zuber*

Supreme Court of Texas

January 28, 1887, Delivered

No. 2189

**Reporter**

67 Tex. 275; 3 S.W. 273; 1887 Tex. LEXIS 863

Leopold Fievel v. William Zuber

**Prior History:** [***1] Appeal from Galveston. Tried below before the Hon. Wm. H. Stewart.

**Disposition:** *Reversed and remanded.*

## Core Terms

mortgage, third party, trust deed, subrogation, courts, rights

## Case Summary

### Procedural Posture

Appellee creditor obtained an interest in land owned by a debtor after the debtor defaulted on a loan. A third party, after satisfying a promissory note for the debtor, obtained an interest in the promissory note and sold the property to appellant purchasers to satisfy the note. The Galveston Court (Texas) entered a judgment for the creditor and the purchaser appealed.

### Overview

The debtor purchased a parcel of land with cash and two promissory notes, which were secured by deeds of trust on the land. The debtor obtained a loan from the creditor which was also secured by a deed of trust on the land. The debtor transferred the land to the creditor to satisfy the loan. The third party then paid the sums due the debtor under the second note. The third party sold the land to the purchaser after the debtor failed to repay the sums advanced. The trial court's judgment for the creditor was reversed. The court held that the trial court improperly charged the jury that the debtor, after transferring the land to the creditor, could not affect the creditor's rights by making a new promise. The case was remanded; it had to be determined if, when the third party paid the second note, there was an agreement that the third party could hold the second note as security for the

payment made on the debtor's behalf. Only if such an agreement expressly or impliedly existed would the third party be substituted to the rights of the initial holder of the second note. If no such agreement existed, the lender's payment of the second note extinguished the mortgage attached to it.

### Outcome

The judgment for the creditor was reversed. The case was remanded for further proceedings.

## LexisNexis® Headnotes

Civil Procedure > ... > Justiciability > Case & Controversy Requirements > General Overview

Civil Procedure > Parties > Intervention > General Overview

Governments > Legislation > Statute of Limitations > General Overview

Real Property Law > Financing > Foreclosures > General Overview

*HN1* The power to make a sale under a deed of trust can be executed although the right of action in the courts upon the debt secured by it is barred by the statute of limitation.

Real Property Law > Financing > Foreclosures > General Overview

Real Property Law > ... > Mortgages & Other Security Instruments > Redemptions > General Overview

Real Property Law > ... > Mortgages & Other Security Instruments > Redemptions > Mortgagor's Right

Real Property Law > Financing > Secondary Financing > General Overview

Real Property Law > Financing > Secondary Financing > Lien Priorities

*HN2* Any one has the right to purchase the equity of redemption in mortgaged property, or he has the right to

purchase the property subject to the mortgage debt. And it may be admitted that neither the mortgagor or mortgagee, after the purchase, can do any act prejudicial to his interest. But it cannot be conceded that a vendee of an estate, with notice of an existing lien upon it, acquires any greater right than his vendor, or that his conveyance deprives the prior mortgagee of any remedy for the collection of his debt which existed at the time of its execution. It follows that if the power in a deed of trust can be executed after an action upon the debt is barred, while the property remains in the hands of the mortgagor, this remedy of the mortgagee cannot be taken away by a sale to a third party who has notice of the incumbrance.

Real Property Law > Financing > Foreclosures > General Overview

*HN3* The mortgage is a mere incident of the debt, and when action on the latter is barred there is no remedy in the courts to enforce the mortgage.

Real Property Law > ... > Mortgages & Other Security Instruments > Satisfaction & Termination > General Overview

Real Property Law > ... > Mortgages & Other Security Instruments > Transfers > General Overview

*HN4* A party who has an interest in property to be protected by discharging an incumbrance upon it, has the right to pay it and to substitute himself to the rights of the lien holder, whether either the creditor or debtor give his assent or not.

Contracts Law > Standards of Performance > Creditors & Debtors

Contracts Law > Third Parties > Subrogation

Real Property Law > ... > Mortgages & Other Security Instruments > Transfers > General Overview

*HN5* Subrogation by agreement of parties can be accomplished by a payment made in accordance with an express understanding between the debtor, the creditor and a third party, to the effect that if such third party pays the debt he may hold the security for his reimbursement. It is also recognized law that a payment upon a like agreement between a stranger and the creditor will have the same effect.

Contracts Law > Standards of Performance > Creditors & Debtors

Contracts Law > Third Parties > Subrogation

Real Property Law > ... > Mortgages & Other Security Instruments > Transfers > General Overview

*HN6* If a third party pay the entire debt in pursuance of an agreement between him and the debtor, upon his doing so he shall be subrogated to the creditor's rights, the agreement will be given effect, and such third party will stand in the place of the creditor as to all persons interested in the property or the security.

Contracts Law > Standards of Performance > Creditors & Debtors

Real Property Law > ... > Mortgages & Other Security Instruments > Transfers > General Overview

*HN7* One may acquire the privilege of a creditor without substitution in the same manner as a mortgage, by agreement with the debtor that he who shall pay for him shall have the privilege; and it makes no difference whether the payment be made to the creditor by him who lends the money or by the debtor with whom the money has been intrusted.

## Headnotes/Syllabus

### Headnotes

**Mortgage. -- Limitation.** -- The power of a trustee to sell under a deed of trust may be executed though a right of action in the courts of the country upon the debt secured by the deed, may be barred by the statute of limitations, and the purchaser takes title free from the lien of a subsequent mortgagee with notice.

**Cases Reviewed.** -- Goldfrank, Frank & Co. v. Young, 64 Texas, 432; and Duty v. Graham, 12 Texas, 427, reviewed.

**Statutes of Limitation.** -- Our statutes of limitation with reference to debts operate solely on the remedy in the courts, but do not destroy the debt; following Goldfrank, Frank & Co. v. Young, and overruling Blackwell v. Barnett, 52 Texas, 326.

**Subrogation.** -- The payment of a debt secured by lien, though made by a stranger to the original contract, if made under an agreement with the creditor that he may hold the security for his reimbursement, subrogates him to the rights of the original creditor.

**Subrogation.** -- If a third party pay the entire debt secured by mortgage, under an agreement between [***2] himself and the debtor, that upon his doing so he shall be subrogated to the rights of the creditor, the agreement will be given effect, and the third party will stand in the place of the original creditor as to all persons interested in the property or the security. The rule in Louisiana under a statute governing it is otherwise.

ELIZABETH CALDCLEUGH

**Subrogation.** -- If, however, the payment of the debt be made at the request of the debtor, with exclusive reliance on his promise to repay, the mortgage debt is extinguished, and no subsequent act of the mortgagor can revive it to the prejudice of a subsequent lien holder or one purchasing under him.

**Counsel:** *McLemore & Gampbell*, for appellant, cited Goldfrank, Frank & Co. v. Young, 5 Texas Law Review, volume 5, No. 130, page 425; Ware v. Bennett, 18 Texas, 729, et seq.; Flanagan v. Cushman, 48 Texas, 256.

*Ballinger, Mott & Terry*, for appellee: That the charge of the court was correct, they cited Revised Statutes, Articles 3205, 3207; Duty v. Graham, 12 Texas, 427; Perkins v. Sterne, 23 Texas, 561; Blackwell v. Barnett, 52 Texas, 326; Wofford v. Unger, 55 Texas, 480; Hale v. Baker & Rice, 60 Texas, 217; Ransom v. Brown, 63 Texas, 190.

[***3] On their proposition that, whilst the vendor of lands on which a deed of trust for purchase money is retained has his remedy either for his debt or for the land, his remedy for the debt is subject to the bar of four years; the assignee of the note has no paramount right to or remedy for the land, and his remedy for the debt is also subject to the bar of four years, cited Baker v. Compton, 52 Texas, 252; Cassady v. Frankland, 55 Texas, 452; Hale v. Baker & Rice, 60 Texas, 217; Ransom v. Brown, 63 Texas, 190.

On their proposition that no admission of the debt, no act or contract of the debtor or mortgagor, subsequent to the junior mortgage or trust deed duly recorded, could have any effect or force whatever against the latter, nor extend limitation, they cited Gillum v. Collier & Richardson, 53 Texas, 592, 600; Wofford v. Unger, 55 Texas, 480; N. Y., L. I. & T. Co. v. Covert, 29 Barbour, 435; Schumucker v. Sibert, 18 Kansas, 104; Larthet v. Hogan, 1 Louisiana Annual, 330; Lord v. Morris, 18 California, 490.

On their proposition that the junior mortgagee or purchaser of the mortgaged property, in relation to the prior mortgage, holds the property in the light of a surety, and entitled [***4] to all the rights and protection of a surety, as to such property, and extensions by K. and R. if they had been valid holders, would have discharged this property as to Zuber, they cited Baylies on Sureties, 490, 494; Kyle v. Davis, 20 Wisconsin, 568; Leston v. Picketts, 24 Wisconsin, 346; Neimcewicz v. Gahn, 3 Paige, 641; Averill v. Taylor, 4 Selden, 51; Haberton v. Bennett, Beatty's Chancery, 386; Willard's Equity Jurisprudence, 113.

On their proposition that the debt as to Zuber being barred, there could be no valid survival, existence or enforcement of

the power of sale as to him, that power being a mere incident, and also barred and extinct, they cited Graham v. Vining, 1 Texas, 639; McClenney v. McClenney, 3 Texas, 114, 192; DeCordova v. Galveston, 4 Texas, 470, 482; Weaver v. Shaw, 5 Texas, 286; Fessenden v. Barrett, 9 Texas, 479, 480; Duty v. Graham, 12 Texas, 437; Perry v. Gregory, 13 Texas, 328; Robinson v. Varnell, 16 Texas, 382; Perkins v. Sterne, 23 Texas, 561; Glasscock v. Nelson, 26 Texas, 150; Ross v. Mitchell, 28 Texas, 154; McMasters v. Mills, 30 Texas, 591; Hale v. Baker & Rice, 60 Texas, 219; Lord v. Morris, 18 California, 482, Low v. Allen, 26 California, 141; [***5] and see cases from Nebraska, Nevada, Kansas, Illinois and Iowa, cited Jones on Mortgages, section 1207.

**Judges:** Gaines, Associate Justice.

**Opinion by:** GAINES

# Opinion

[*277] [**273] On the fifteenth day of June, 1874, Eliza H. Wakeman sold the north half of the northeast quarter of lot forty-three in the city of Galveston to one Lawson for three thousand dollars. The sum of one thousand dollars was paid at the time of the transaction and two notes were given for the balance, each for one thousand dollars, and bearing ten per cent interest, payable respectively at one and two years after date. The notes were secured by a deed in trust upon the lot conveyed, executed to one R. A. Brown, as trustee, at the time of the sale, and authorized him, in case of default in payment of either of them, to sell the property at public sale in order to satisfy the debt. The first note was paid. When the second fell due the interest was paid and an extension of twelve months was given.

Before the maturity of this note, however, appellee Zuber loaned Lawson seven thousand dollars and took a deed in trust from him on the east half of the lot to secure the debt, and in March, 1880, Lawson and wife [***6] conveyed to Zuber the premises so mortgaged in satisfaction of the loan. Lawson's note to Mrs. Wakeman was sent to Ball, Hutchings & Co. for collection, and when the twelve months extension had run out, was, at the request of Lawson made to R. A. Brown, taken up by the firm of which the latter was a member, Lawson promising to arrange to pay it in a few days. The note was held by this firm until it was paid by money furnished by Kauffman & Runge for that purpose. This occurred some seven or eight days after Brown took up the note. There is evidence tending to show that when Kauffman & Runge agreed to let Lawson have the money he promised that they should hold the note as security.

On the fifteenth day of December, 1879, Lawson endorsed a new promise upon the [**274] note sufficient to postpone the bar of limitation so far as he was concerned.

On March 10, 1881, the note being unpaid, Brown was requested by Kauffman & Runge to sell the property under the deed of trust to pay the debt; but declined to do so. The deed of trust having provided for such a contingency, Kauffman & Runge, appointed one Ruhl substitute trustee, who immediately advertized the entire mortgaged property, [***7] and sold it on the twenty-ninth day of the same month. At this sale appellant Fievel became the purchaser, and shortly after obtained possession of the [*278] premises. Zuber brought suit and obtained a verdict and judgment in the court below and Fievel now appeals.

The court below charged the jury, in substance, that after the deed of trust upon the lot was executed to Austin to secure Zuber's debt, Lawson could not affect the latter's rights, by making a new promise, and that if the note to Miss Wakeman was barred by the lapse of four years from its maturity, the sale from Ruhl, trustee to Fievel, passed no title. This charge of the court is assigned as error. The latter proposition is in accordance with the latest decision of this court upon the question at the time the charge was given. (Blackwell v. Barnett, 52 Texas, 331.)

But in the more recent case of Goldfrank, Frank & Co. v. Young, 54 Texas, 432, that decision was overruled, and it was held that *HN1* the power to make a sale under a deed of trust could be executed, although the right of action in the courts upon the debt secured by it was barred by the statute of limitation. In that case the controversy was between [***8] the original parties to the transaction. In this, the rights of a third party as a purchaser have intervened. But we are of opinion that, as a matter of substantial justice, there is no difference between the two.

*HN2* Any one has the right to purchase the equity of redemption in mortgaged property, or -- to express it in a manner more in accord with the doctrine of our courts -- he has the right to purchase the property subject to the mortgage debt. And it may be admitted that neither the mortgagor or mortgagee, after the purchase, can do any act prejudicial to his interest. But it can not be conceded that a vendee of an estate, with notice of an existing lien upon it, acquires any greater right than his vendor, or that his conveyance deprives the prior mortgagee of any remedy for the collection of his debt which existed at the time of its execution. It follows, we think, that if the power in a deed of trust can be executed after an action upon the debt is barred, while the property remains in the hands of the mortgagor, this remedy of the mortgagee can not be taken away by a sale to a third party who has notice of the incumbrance.

But it is contended on behalf of appellees that [***9] the doctrine laid down by this court in *Goldfrank, Frank & Co. v. Young, supra*, should not be adhered to; and it is due to the able and exhaustive argument filed by their counsel that the question should not be passed unnoticed. But for the fact that the former decisions of this court seemingly tend to a different conclusion, we think the authority of that case not likely to have been called in question. [*279] But, with one exception, if there be a seeming inconsistency between that and former cases, we think it more apparent than real. The doctrine in Duty v. Graham, 12 Texas, 427, and in the subsequent cases approving it, is that *HN3* the mortgage is a mere incident of the debt, and that when action on the latter is barred there is no remedy in the courts to enforce the mortgage. This does not necessarily lead to the conclusion that this statute operates as well upon any remedy the debtor may have outside of the courts.

The statute does not say that no debt shall be collected, but that no action shall be brought. Nor does it provide that the debt shall be considered extinguished. And statutes of limitation worded like ours are generally held to operate solely upon the remedy [***10] in the courts, and not to destroy the debt. The one case we have holding the contrary doctrine is Blackwell v. Barnett, 56 Texas, 326, which is itself in conflict with the decision in Shepherd v. Ireland, 36 Texas, 655.

The opinion in Goldfrank, Frank & Co. v. Young shows that Blackwell v. Barnett was overruled after [**275] most careful consideration; and we think the principles announced in that opinion supported by sound reasoning and high authority. We are of opinion, therefore, that the doctrine there laid down should be adhered to, and that it is controlling upon the question of the correctness of the instructions upon the trial of the cause. We therefore hold that that court erred in its charge to the jury, and that the judgment must be reversed, unless the uncontroverted facts show that under the law no other judgment could have been lawfully rendered in the court below.

It is insisted on behalf of appellees that the note of Lawson, secured by the deed in trust from him to Miss Wakeman, was paid in so far as the rights of Zuber are concerned. There is evidence in the record tending to this conclusion; but whether all the facts proved establish a payment or a subrogation [***11] is a question which we can not here determine. *HN4* A party who has an interest in property to

be protected by discharging an incumbrance upon it, has the right to pay it and to substitute himself to the rights of the lien holder, whether either the creditor or debtor give his assent or not. But neither Brown nor Kauffman & Runge had such right. As long as the note remained undischarged in the hands of the original holder or his endorsers, they were strangers to the title. Brown, as mere trustee in the deed in trust, had the power to make a sale if the debt were not paid, [*280] but had no interest in the property to be protected by the discharge of the lien.

If any subrogation took place, therefore, it must have been by agreement of parties. That this *HN5* can be accomplished by a payment made in accordance with an express understanding between the debtor, the creditor and a third party, to the effect that if such third party pays the debt he may hold the security for his reimbursement there can be no doubt. (Dillon v. Kauffman & Runge, 58 Texas, 696; Flanagan v. Cushman, 48 Texas, 241.) It is also recognized law that a payment upon a like agreement between a stranger and the creditor [***12] will have the same effect. In both these cases, however, this would seem a virtual assignment without reference to the doctrine of subrogation. But upon the proposition that a substitution can be brought about by a contract between debtor and a volunteer, to which the creditor is not a party, the law is not quite so clear. That it cannot be done as to a part of the debt, or in any manner to affect the rights of the creditor to his prejudice, does not admit of doubt. But there are numerous decisions which recognize the doctrine that, *HN6* if a third party pay the entire debt in pursuance of an agreement between him and the debtor, upon his doing so he shall be subrogated to the creditor's rights, the agreement will be given effect, and such third party will stand in the place of the creditor as to all persons interested in the property or the security.

In some of the cases the point is directly decided. (Fuller v. Hollis, 57 Ala., 435; Owen v. Cook, 3 Tenn. Ch., 78; Mitchell v. Butt, 45 Ga., 162; New Jersey Midland R. R. Co. v. Wortendyke, 27 N. J. Eq., 658; Morgan v. Hammett, 23 Wis., 30; Caudle v. Murphy, 89 Ill., 352; see also 1 Jones on Mortgages, sec. 877; 3 Pomeroy's Eq., sec. [***13] 1212, note 2; Sheldon on Subrogation, secs. 247 and 248.)

We have not found the rule otherwise, except in the State of Louisiana. (Harrison v. Bisland, 5 Rob., 204; Hoyle v. Cazabot, 25 La. Ann., 438; Brice v. Watkins, 30 La. Ann., 21.) And the opinion in the case first cited (Harrison v. Bisland) shows that the law upon this subject is governed by statute in the State. (See Civil Code La., art. 2156.) Such is

not the rule of the civil law. Domat says: *HN7* "One may acquire the privilege of a creditor without substitution in the same manner as a mortgage, by agreement with the debtor that he who shall pay for him shall have the privilege; and it makes no difference whether the payment be made to the creditor by him who lends the money or by the [*281] debtor with whom the money has been intrusted." (2 Strahan's Domat's Civil Law, Cushing's ed., p. 698, sec. 1783.)

The reason of the rule is thus admirably stated in the author's notes to the text quoted: "The manner of acquiring the right of the creditor, without his substitution, is just [**276] and equitable in order to facilitate the payment of debts. It is but just that the debtors themselves should have the power to [***14] put in place of the creditors those who pay for them, since nobody receives any prejudice thereby, and since it is the interest of the debtor that he should have the power of making his condition easier by changing his creditor."

If, therefore, when Brown paid the note to Ball, Hutchings & Co., there was an express agreement between him and Lawson, that his firm should hold the note until the money was repaid, or, if the payment was made under circumstances from which such an understanding might reasonably be implied, then Brown or the firm of which he was a member became substituted to the rights of the holder of the note at the time of payment; and under a like agreement or understanding the same rights would be transferred to Kauffman & Runge when they paid the money to Lawson to be paid to Brown.

If, on the other hand, when Brown paid the note, he did it merely as an advance upon Lawson's individual credit and relied solely upon Lawson's promise to pay it back, then the mortgage debt was extinguished, and no subsequent act on part of Lawson could revive it as to appellee Zuber.

From what we have said it will be seen the case must be reversed and remanded. There are other [***15] points raised in the brief of appellee's counsel questioning the validity of the sale; but since they have not been argued on behalf of appellant, we shall decline to pass upon them here.

For the error in the charge as pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered January 28, 1887.

ELIZABETH CALDCLEUGH



ESTHER BUCHANAN, Plaintiff, v. NORTHLAND GROUP, INC., Defendant.

Case No. 1:12-cv-1011

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION

2013 U.S. Dist. LEXIS 187737

November 7, 2013, Decided
November 7, 2013, Filed

**PRIOR HISTORY:** Buchanan v. Northland Group,
Inc., 2013 U.S. Dist. LEXIS 187735 (W.D. Mich., Nov.
7, 2013)

**COUNSEL:** [*1] For Esther Buchanan, on behalf of
plaintiff and the class defined herein, plaintiff: Thomas
Everett Soule, LEAD ATTORNEY, Daniel A. Edelman,
Edelman Combs Latturner & Goodwin LLC, Chicago,
IL.

For Northland Group, Inc., defendant: David M. Schultz,
Jennifer W. Weller, Hinshaw & Culbertson LLP (IL),
Chicago, IL.

**JUDGES:** HON. JANET T. NEFF, United States Dis-
trict Judge.

**OPINION BY:** JANET T. NEFF

**OPINION**

**OPINION AND ORDER**

Plaintiff filed this case against Defendant, alleging
that Defendant sent her a debt collection letter that vio-
lates the Fair Debt Collection Practices Act (FDCPA), 15
U.S.C. § 1692 *et seq.* Defendant moves to dismiss Plain-
tiff's complaint under FED. R. CIV. P. 12(b)(6) for failure
to state a claim (Dkt 19). Plaintiff filed a response in
opposition to Defendant's motion (Dkt 21), and Defend-
ant filed a reply (Dkt 22). Both parties have also since
provided this Court with additional authorities to consid-
er (Dkts 30, 34-36). Having conducted a Pre-Motion
Conference in this matter and having fully considered the
parties' written briefs and accompanying exhibits, the
Court finds that the relevant facts and arguments are ad-
equately presented in these materials and that oral argu-

ment would not aid the decisional [*2] process. *See*
W.D. Mich. LCivR 7.2(d). For the reasons that follow,
the Court determines that Defendant's Motion to Dismiss
is properly granted.

**I. BACKGROUND**

Plaintiff filed this suit against Defendant on Sep-
tember 21, 2012, alleging that Defendant's October 12,
2011 debt collection letter to her constituted an "unfair
and false act[] and practice[]" in violation of various
provisions of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(2),
1692e(5), 1692e(10), and 1692f, because Defendant
failed to disclose that her debt was "time-barred" (Dkt 1,
Compl. ¶ 20). Plaintiff alleges that "[t]he nondisclosure
is exacerbated by the offer of a 'settlement'" in the letter,
which "implies a colorable obligation to pay" (*id.* ¶ 21).
The settlement language is as follows:

> The current creditor is willing to re-
> duce your balance by offering you a set-
> tlement. We are not obligated to renew
> this offer. Upon receipt and clearance of
> $1,668.96, your account will be satisfied
> and closed and a settlement letter will be
> issued. This offer does not affect your
> rights set forth below. LVNV Funding
> LLC has purchased the above referenced
> account from the above referenced Previ-
> ous Creditor. LVNV Funding LLC has
> placed your account    [*3] with this
> agency for collection.

(Dkt 1-1, Compl. Ex. A).¹ Plaintiff indicates in her Com-
plaint that she seeks to bring her FDCPA claim on behalf

of herself and a class of similarly situated persons (*id.* ¶¶ 24-30).

> 1    The letter was attached as Exhibit A to Plaintiff's Complaint and is therefore deemed to be a part of the pleadings for purposes of deciding the motion to dismiss. *See Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001).

This Court held a Pre-Motion Conference in December 2012 on Plaintiff's request to move for class certification in this matter and Defendant's request to file a motion to dismiss (Dkts 7-8). The parties agreed to first brief Defendant's proposed dispositive motion before turning to the class certification question, and the Court issued a briefing schedule only as to Defendant's proposed dispositive motion (Dkt 12).[2] The parties filed their motion papers in March 2013 (Dkts 19-22) and have also since filed additional authorities for this Court's consideration (Dkts 30, 34-36).

> 2    *See* FED. R. CIV. P. 23(c)(1) (requiring only that courts decide motions for class certification "at an early practicable time"); 7AA CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL [*4] PRACTICE & PROCEDURE § 1785.3 (3d ed. 2013) ("The time at which the court finds it appropriate to make its class-action determination may vary with the circumstances of the particular case.").

## II. ANALYSIS

### A. Motion Standard

Defendant filed its Motion to Dismiss under FED. R. CIV. P. 12(b)(6) for failure to state a claim. A complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

In deciding a motion to dismiss for failure to state a claim under FED.R. CIV.P. 12(b)(6), the court must treat all well-pleaded allegations in the complaint as true and draw all reasonable inferences from those allegations in favor of the nonmoving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). However, "a court is not required to accept [*5] as true unwarranted legal conclusions and/or factual allegations." *Harvey v. Great*

*Seneca Fin. Corp.*, 453 F.3d 324, 327 (6th Cir. 2006) (quoting *Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295, 300 (6th Cir. 2006)).

### B. Discussion

Congress enacted the FDCPA in order to eliminate "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). The statute is very broad, and was intended to remedy "what it considered to be a widespread problem." *Harvey*, 453 F.3d at 329 (quoting *Frey v. Gangwish*, 970 F.2d 1516, 1521 (6th Cir. 1992)). The FDCPA's private-enforcement provision, § 1692k, authorizes "any aggrieved person" to recover damages from "any debt collector who fails to comply with any provision" of the FDCPA. *Marx v. Gen. Revenue Corp.*,    U.S.    ; 133 S. Ct. 1166, 1171, 185 L. Ed. 2d 242 (2013) (quoting 15 U.S.C. § 1692k(a)); *see also Wright v. Fin. Serv. of Norwalk, Inc.*, 22 F.3d 647, 649 (6th Cir. 1994).

Here, Plaintiff alleges that Defendant's failure to disclose in the debt collection letter "that the debt was time-barred" constitutes a violation of the FDCPA (Dkt 21 at 17-19). "When interpreting the FDCPA, we begin with the language of the statute [*6] itself." *Harvey*, 453 F.3d at 329 (quoting *Schroyer v. Frankel*, 197 F.3d 1170, 1174 (6th Cir. 1999)). The FDCPA provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Without limiting the general applicability of that prohibition, the statute provides a list of sixteen specific violations, including the three subsections highlighted by Plaintiff in her Complaint (Compl. ¶¶ 20, 22), which prohibit:

> (2) The false representation of--
>
> > (A)   the character, amount, or legal status of any debt; or
> >
> > (B)   any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
>
> * * *
>
> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken.
>
> * * *

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

(15 U.S.C. § 1692e.)

The FDCPA also provides that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. This statute likewise provides a list [*7] of specific violations, although Plaintiff does not specify any of the eight prohibited unfair practices in her Complaint, presumably relying instead on the general prohibition against unfair practices (Compl. ¶¶ 20, 23).

When assessing whether particular conduct violates the FDCPA, courts use the "least-sophisticated-consumer" standard, an objective standard. *Harvey*, 453 F.3d at 329, 331. This standard ensures "that the FDCPA protects all consumers, the gullible as well as the shrewd." *Kistner v. Law Offices of Michael P. Margelefsky, LLC*, 518 F.3d 433, 438 (6th Cir. 2008) (quotation marks and citations omitted). The standard "also prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care." *Id.* at 438-39 (quotation marks and citations omitted). In the Sixth Circuit, "[i]t is well-settled that courts may properly make the objective determination whether language effectively conveys a notice of rights to the least sophisticated debtor." *Fed. Home Loan Mortgage Corp. v. Lamar*, 503 F.3d 504, 508 n.2 (6th Cir. 2007) (quoting *Savage v. Hatcher*, 109 F. App'x 759, 762 (6th Cir. 2004)).

In [*8] response to Plaintiff's allegation that Defendant violated the FDCPA in failing to disclose the "time-barred" nature of the debt, Defendant points out that the FDCPA does not specifically require a debt collector to disclose the applicable limitations period (Dkt 20 at 12-13). Defendant's point is well taken. A debt collector must send a consumer a written notice that contains the following contents:

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and [*9] address of the original creditor, if different from the current creditor.

15 U.S.C. § 1692g(a) (Notice of debt; contents). The statute does not require a debt collector to make or include a legal opinion on the expiration of the limitations period for filing suit, or even to identify the applicable limitations period at all.

Indeed, the debt is "time-barred" only to the extent that judicial enforcement to collect on the debt is purportedly precluded. A debt is not extinguished merely because the limitations period expires. "[T]he moral obligation to pay a just debt remains," even where the power to enforce payment is stayed by operation of law. *De Vries v. Alger*, 329 Mich. 68, 44 N.W.2d 872, 876 (Mich. 1950). In Michigan, the statute of limitations is a procedural defense that does not alter the creditor's substantive rights. *See Lothian v. Detroit*, 414 Mich. 160, 324 N.W.2d 9, 13 (Mich. 1982) (citing *Forest v. Parmalee*, 402 Mich. 348, 262 N.W.2d 653, 657 (Mich. 1978)). Therefore, a creditor may attempt to collect a debt outside of court, even though a statute of limitations defense would defeat any claim that the creditor might try to bring in court.

Plaintiff proffers several policy-based reasons for a debt collector to nonetheless [*10] disclose "that the debt was time-barred" (Dkt 21 at 7-15), but the authorities upon which it relies for these arguments, Federal Trade Commission documents in an unrelated case and two reports for reforming the debt collection system, do not call on courts to read the FDCPA one way or another, but only highlight a variety of concerns with potential reforms. *See generally Rice v. Midland Credit Mgmt., Inc.*, 933 F. Supp. 2d 1040, 1048 (N.D. Ill. 2013) (ultimately concluding that these authorities are "too general and equivocal to convince the Court that it should conclude that Plaintiff has stated a claim in this case").

Hence, the Court is likewise unpersuaded by Plaintiff's urging for this Court to follow the reasoning of the

magistrate judge in *McRill v. Nationwide Credit, Inc.*, No. 12-2175, 2012 U.S. Dist. LEXIS 183009, 2012 WL 6727974, at *6 (C.D. Ill. Dec. 6, 2012), Report and Recommendation, adopted 12-CV-2175, 2012 U.S. Dist. LEXIS 182528, 2012 WL 6727722 (C.D. Ill. Dec. 28, 2012), who concluded that the FTC's position in these documents "makes sense" (Dkt 21 at 20-22). *McRill* is not binding on this Court. Moreover, as Defendant accurately points out, the magistrate judge in *McRill* acknowledged that his opinion was a departure, that "most [*11] courts to consider FDCPA claims similar to Plaintiff's have concluded that, because, one, state law permits a debt collector to request payment even after the statute of limitations has run, and, two, the FDCPA does not explicitly require a debt collector to disclose that a debt is time-barred, a debt collector does not violate the FDCPA unless it actually sues on a time-barred debt." *McRill*, 2012 U.S. Dist. LEXIS 183009, 2012 WL 6727974, at *4 (citing cases). The Court agrees with Defendant that the passage of the limitations period does not affect the validity of the debt, and Defendant's failure to mention the limitations period in the October 12, 2011 letter attempting to collect on the debt does not constitute a "false representation," 15 U.S.C. § 1692e(10), or unfair practice, 15 U.S.C. § 1692f, nor does the omission in the letter falsely represent the "legal status of the debt," 15 U.S.C. § 1692e(2)(A).

The plausibility of Plaintiff's claim under the FDCPA hinges, if at all, on her additional allegation that the debt collection letter "implies that a legally enforceable obligation existed" (Dkt 21 at 20). *See, e.g., Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 32-33 (3d Cir. 2011) (holding that "the FDCPA [*12] permits a debt collector to seek voluntary repayment of the time-barred debt so long as the debt collector does not initiate or threaten legal action in connection with its debt collection efforts"); *Freyermuth v. Credit Bureau Servs., Inc.*, 248 F.3d 767, 771 (8th Cir. 2001) (holding that "in the absence of a threat of litigation or actual litigation, no violation of the FDCPA has occurred when a debt collector attempts to collect on a potentially time-barred debt that is otherwise valid"). Plaintiff alleges that "[t]he nondisclosure is exacerbated by the offer of a 'settlement'" in the letter, which "implies a colorable obligation to pay" (Dkt 1, Compl. ¶ 21). Plaintiff argues that inclusion of the settlement language is a "false and unfair tactic" (Dkt 21 at 20).

The Court disagrees. The debt collection letter sent to Plaintiff indicates that "upon receipt and clearance of $1,668.96, your account will be satisfied and closed and a settlement letter will be issued." Even the least sophisticated consumer would not infer a threat of litigation from this language but would understand that the letter proposed settlement of the debt, not settlement of a future or ongoing lawsuit.[3] The October [*13] 12, 2011 settlement language does not constitute an impermissible "threat to take any action that cannot legally be taken," 15 U.S.C. § 1692e(5), nor does its inclusion constitute a false representation, 15 U.S.C. § 1692e(10), or an unfair practice, 15 U.S.C. § 1692f, under the FDCPA. "To hold that a debt collector cannot offer payment options as part of an effort to resolve an outstanding debt, possibly without litigation, would force honest debt collectors seeking a peaceful resolution of the debt to file suit in order to advance efforts to resolve the debt--something that is clearly at odds with the language and purpose of the FDCPA." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 399 (6th Cir. 1998); *see also Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 775 (7th Cir. 2007) ("There is nothing improper about making a settlement offer."); *Stricklin v. First Nat'l Collection Bureau, Inc.*, 3:10-CV-01027-JPG, 2012 U.S. Dist. LEXIS 45695, 2012 WL 1076679, at *11 (S.D. Ill. Mar. 30, 2012) ("On its face, the term 'settlement offer' does not violate the FDCPA."). Indeed, "[a]llowing debt collectors to send such a letter is not only consistent with the Act but also may result in resolution of the debt without [*14] resorting to litigation, saving all parties involved the needless cost and delay of litigation as is exemplified by this very case." *Lewis*, 135 F.3d at 399.

> 3  Indeed, even in the Report and Recommendation upon which Plaintiff relies for her policy-based arguments, the magistrate judge rejected the plaintiff's similar contention that the defendant's offer of settlement in that case "exacerbated" the defendant's nondisclosure, determining that there is "nothing inherently misleading or deceptive" about the letter's offer of settlement. *McRill*, 2012 U.S. Dist. LEXIS 183009, 2012 WL 6727974, at *6, n.9.

In sum, even if all the facts in her Complaint are accepted as true, Plaintiff's Complaint fails to state a plausible claim under the FDCPA.

## III. CONCLUSION

For the foregoing reasons, the Court grants Defendant's Motion to Dismiss. As the Court's decision resolves all pending claims, a Judgment will be entered consistent with this Opinion and Order. *See* FED. R. CIV. P. 58. Accordingly:

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss (Dkt 19) is GRANTED.

DATED: November 7, 2013

/s/ Janet T. Neff

JANET T. NEFF

United States District Judge

## **JUDGMENT**

In accordance with the Opinion and Order entered this date:

It is the Judgment  [*15] of the Court that Plaintiff's complaint be DISMISSED pursuant to FED. R. CIV. P. 12(b)(6) for failure to state a claim.

DATED: November 7, 2013

/s/ Janet T. Neff

JANET T. NEFF

United States District Judge

## Jenkins v. RJM Acquisitions, LLC

United States District Court for the Western District of North Carolina, Statesville Division

February 14, 2013, Decided; February 14, 2013, Filed

CIVIL ACTION NO.: 5:10CV27-RLV

**Reporter**

2013 U.S. Dist. LEXIS 20133; 2013 WL 589006

MATT JENKINS, Plaintiff, vs. RJM ACQUISITIONS, LLC, Defendant.

**Prior History:** _Jenkins v. RJM Acquisitions LLC, 2012 U.S. Dist. LEXIS 68182 (W.D.N.C., May 16, 2012)_

## Core Terms

collection, cause of action, acknowledgment, summary judgment motion, consumer, statute of limitations, affirmation, alleges, collection agency, letters, buyer, summary judgment, documentation, Statutes, genuine, unfair

**Counsel:** [*1] For Matt Jenkins, Plaintiff: James Blakely Norman, LEAD ATTORNEY, Durham, NC; William Andrew LeLiever, LEAD ATTORNEY, LeLiever Law, P.A., Raleigh, NC.

For James T. Ward, Trustee, Intervenor Plaintiff: A. Cotten Wright, LEAD ATTORNEY, Grier Furr & Crisp, PA, Charlotte, NC.

For RJM Acquisitions, LLC, Defendant: Tracy Thompson Vann, Rock Hill, SC.

**Judges:** Richard L. Voorhees, United States District Judge.

**Opinion by:** Richard L. Voorhees

## Opinion

**Memorandum and Order**

**THIS CAUSE** is before the Court upon cross-motions for summary judgment, filed by the Defendant, RJM ACQUISITIONS, LLC, (Docs. 42, 43), and by the Plaintiff, MATT JENKINS, (Docs. 33, 34), as well as all supporting memoranda and exhibits.

**I.**

Plaintiff Matt Jenkins ("Jenkins") initiated this lawsuit on February 16, 2010, with the filing of a Complaint in Iredell County Superior Court, Iredell County, North Carolina. (Doc. 1 / Exh. A) On March 3, 2010, Defendant RJM Acquisitions, LLC ("RJM"), filed a timely Notice of Removal. (Doc. 1).

After seeking leave of Court, on September 22, 2010, Jenkins was permitted to file an Amended Complaint. (Docs. 10,17,18). Jenkins' Amended Complaint alleges six (6) causes of action based upon alleged violations of the Fair Credit [*2] Reporting Act, _15 U.S.C. § 1681, et. seq._ ("FCRA") (Doc. 18, at 3), the Fair Debt Collection Practices Act, _15 U.S.C. § 1692, et seq._ ("FDCPA") (Doc. 18, at 5), and Title 70 of the North Carolina General Statutes governing the collection of consumer debt, _N.C. GEN. STAT. § 58-70-110, et seq._ (Doc. 18, at 3-6). Plaintiff's factual allegations are as follows:

- RJM purchased defaulted and charged-off credit card accounts that RJM contends belong to Jenkins;

- RJM sent collection letters to Jenkins making offers of settlement, including offers to accept partial payments;

- RJM's collection letters to Jenkins did not disclose the nature and consequences of affirming or acknowledging any debt barred by the statute of limitations or advise Jenkins that he was not legally obligated to do so under North Carolina law;

- The credit card accounts RJM sought to collect on had been charged-off in 1994;

- Jenkins, a resident of California in 1994, relocated to North Carolina in 2007;

- The credit card accounts RJM sought to collect on were time-barred under both California and North Carolina law;

- On February 24, 2009, Jenkins phoned RJM in an attempt to obtain additional information about the outstanding [*3] debts;

• During the February 24, 2009 telephone call, the RJM collection representative asked Jenkins if he wanted to settle the debts and / or if he was willing to acknowledge that the accounts belonged to him;

• The RJM collection representative did not say anything to Jenkins during the February 24, 2009 phone call regarding the nature and consequences of affirming or acknowledging a time-barred debt or advise Jenkins that he was not legally obligated to do so under North Carolina law;

• After Jenkins indicated that he disputed the debt, the RJM collection representative advised Jenkins that the accounts would be closed;

• RJM continued collection efforts after the RJM representative stated that the accounts would be closed.

(Am. Compl., 2-3).

On April 11, 2012, Jenkins filed a voluntary petition for relief pursuant to Chapter 7 of the United States Bankruptcy Code in the Bankruptcy Court in this district. (Document #52) *(See WDNC Bankruptcy Case No.: In re Jenkins,* 12-50413). On May 12, 2012, pursuant to *FED. R. CIV. P. 24(a)(2)*, the Bankruptcy Trustee ("Trustee") was permitted to intervene in the instant case as a real party in interest. (Doc. 54)

The Court also takes judicial notice [*4] that Jenkins has commenced at least ten (10) different civil actions in the Western District of North Carolina, in each instance alleging violations of the same federal statutes against various creditors. Many, if not all, of the cases brought by Jenkins in this district have since been settled by the Trustee.

## II.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *FED. R. CIV. P. 56(a)* (2010). In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *FED. R. CIV. P. 56(c)(1)*; *Anderson v. Liberty Lobby, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*

(applying former version of *Rule 56*); *Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* (same). A genuine issue exists only if "the evidence is such that a reasonable [*5] jury could return a verdict for the non-moving party." *Anderson, 477 U.S. at 248*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. A "mere scintilla of evidence" is insufficient to overcome summary judgment. *Anderson, 477 U.S. at 249-50*. In conducting its analysis, the Court views the evidence in the light most favorable to the non-moving party. *Celotex Corp., 477 U.S. at 325*.

When considering cross-motions for summary judgment, the court "examines each motion separately, employing the familiar [*Rule 56(c)*] standard." *Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351 (4th Cir. 2011)* (internal citations omitted); *Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)* (Court reviews each motion separately on its own merits "to determine whether either party deserves judgment as a matter of law") (internal citations omitted). When considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing the motion. *Rossignol, 316 F.3d at 523* (internal citation omitted).

## III.

Jenkins asserts claims alleging that RJM violated various aspects of [*6] the FCRA, the FDCPA, and Title 70 of the North Carolina General Statutes. Since both parties move for summary judgment, the viability of each claim will be discussed separately and the parties' respective legal arguments concerning each claim will be addressed in connection with the relevant statutory provision.

### A. Fair Credit Reporting Act

Jenkins alleges that RJM violated the FCRA, which states in pertinent part:

(a) [A]ny consumer reporting agency may furnish a consumer report under the following circumstances and no other . . . . (3) to a person which it has reason to believe (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of the consumer.

*15 U.S.C. § 1681b(a)(3)(A) (2010).*

To prove a violation of _Section 1681b_, Jenkins must show that RJM acted with an impermissible purpose in obtaining his consumer credit report. _See_ _Yohay v. City of Alexandria Employees Credit Union, 827 F.2d 967, 972 (4th Cir. 1987)_. Under _§ 1681b_, an impermissible purpose includes any purpose not expressly identified as permissible within _§ 1681b(a)(3)(A)- (E)_ [*7] . _Yohay, 827 F.2d at 972_ (citing _Hansen v. Morgan, 582 F.2d 1214, 1219-20 (9th Cir. 1978))_. Collection of an outstanding debt is explicitly included within _§1681b(a)(3)(A)_ as a "permissible purpose" to review a consumer's credit report.

Relevant to this claim, Jenkins alleges that between the months of June 2007 and July 2008, RJM obtained copies of his TransUnion consumer credit report. Jenkins acknowledges that RJM is a debt collector and that debt collectors as such may obtain credit reports. For purposes of _§ 1681b_, the issue presented is whether RJM was the owner of a debt belonging to Jenkins. RJM produces documentation of its purchases of the Jenkins' accounts, purchases from Le Petomane XXII, Inc., on January 25, 2005, and Wells Fargo Bank on December 22, 2005. (Doc. 43-1 / Greenberg Aff. ¶¶2-3, Exhs. A, B). Nothing in the record suggests illegality or impropriety in these purchases. The various credit card debt obligations — the subject of these sales - were incurred by Plaintiff Matthew A. Jenkins, identifying him by his social security number, address, and phone number. Pursuant to the information provided by the sellers, Jenkins is the account holder. When RJM purchased [*8] Jenkins' accounts, RJM then became situated as having a "permissible purpose" under _15 U.S.C. § 1681b_. For this reason, with respect the first cause of action, Jenkins' motion for summary judgment is denied and RJM's motion for summary judgment is granted.

B. Fair Debt Collection Practices Act

Jenkins' fifth cause of action asserts a claim against RJM pursuant to various sections of the FDCPA. The FDCPA states that "a debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt". _15 U.S.C. § 1692f_. Included in the list of unfair and unconscionable means is the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law. _Id._ at _§ 1692f(1)_.

Jenkins' FDCPA claim is based upon three scenarios alleged in the Amended Complaint. Jenkins alleges that RJM violated the FDCPA by attempting to collect time-barred debts, by requesting an "acknowledgment" from Jenkins

regarding those debts, and by continuing to collect the debts after the RJM representative stated the accounts were being closed. (_Id._ at 8.) [*9] However, the FDCPA does not prohibit seeking acknowledgments of a debt or trying to collect debt that is beyond the statute of limitations so long as litigation is not threatened or commenced. _Freyermuth v. Credit Bureau Servs., Inc., 248 F.3d 767, 771 (8th Cir. 2001)_. There is no evidence that RJM threatened litigation, nor has Jenkins ever alleged that litigation was threatened by RJM. A statement that a given account is going to be closed amidst ongoing collection efforts does not amount to a violation of _§ 1692f_. Based on the foregoing, regarding the fifth cause of action, Jenkins motion for summary judgment is denied and RJM's motion for summary judgment is granted.

C. North Carolina Debt Collection Statutes

Jenkins' second, third, fourth, and sixth causes of action assert claims against RJM pursuant to various sections of North Carolina's debt collection statutory scheme.

1. Second Cause of Action

Jenkins alleges RJM continued collection efforts without documentation in violation of the N.C. General Statutes, which state, in relevant part:

> When the collection agency is a debt buyer or acting on behalf of a debt buyer, bringing suit or initiating an arbitration proceeding against the [*10] debtor, or otherwise attempting to collect on the debt without (i) valid documentation that the debt buyer is the owner of the specific debt instrument or account at issue and (ii) reasonable verification of the amount of the debt allegedly owed by the debtor. For purposes of this subdivision, reasonable verification shall include documentation of the name of the original creditor, the name and address of the debtor as appearing on the original creditor's records, the original consumer account number, a copy of the contract or other document evidencing the consumer debt, and an itemized accounting of the amount claimed to be owed, including all fees and charges.

_N.C. Gen. Stat. § 58-70-115(5)_(2009). Section 115(5) became law in October of 2009 and was explicitly made non-retroactive. _See_ 2009 North Carolina Laws S.L. 2009-573 (S.B. 974).

Following the February 24, 2009 telephone conversation between Jenkins and RJM, there were no further efforts

made to collect Jenkins' debt. [1] Therefore, any events supporting Jenkins' claim under N.C. GEN. STAT. § 115(5) must be those that occurred on and before February 24, 2009. Since all of the applicable collection activity pre-dated the addition [*11] of § 115 to the North Carolina Code, this section is not applicable. There is no genuine dispute as to any material fact regarding continued collection efforts by RJM. Therefore, with respect to the second cause of action, Jenkins' motion for summary judgment is denied and RJM's motion for summary judgment is granted.

## 2. Third Cause of Action

Jenkins further alleges that RJM's collection letters and telephone conversations amount to unfair debt collection practice in violation of N.C. GEN. STAT. § 58-70-115(1) because they sought an "acknowledgment" of debt without disclosing the nature and consequences of such affirmation. North Carolina's *Section 58-70-115(1)* provides:

> No collection agency shall collect or attempt to collect any debt by use of any unfair practices. Such practices [*12] include, but are not limited to, the following:
>
> (1) Seeking or obtaining any written statement or acknowledgment in any form containing an affirmation of any debt by a consumer who has been declared bankrupt, an acknowledgment of any debt barred by the statute of limitations, or a waiver of any legal rights of the debtor without disclosing the nature and consequences of such affirmation or waiver and the fact that the consumer is not legally obligated to make such affirmation or waiver.

N.C. GEN. STAT. § 58-70-115(1).

While it is undisputed that RJM sent several letters to Jenkins regarding his outstanding debt, at no time did RJM expressly solicit a written affirmation or acknowledgment from Jenkins. In order for an acknowledgment or affirmation to renew the expired statute of limitations, the acknowledgment must be in writing. *See N.C. GEN. STAT. § 1-26* (2010) ("no acknowledgment or promise to pay is evidence of a new of continuing contract, from which the statutes of limitations run, unless it is contained in some writing signed by the party to be charged thereby"). A mere oral acknowledgment of the debt is insufficient. [2] *See e.g., George W. Helm Co., v. Griffin, 112 N.C. 356, 16 S.E. 1023 (N.C. 1893).* [*13] There are no facts supporting a contention that RJM solicited a written affirmation or acknowledgment from Jenkins. The February 2009 phone conversation, initiated by Jenkins, cannot support this claim as Jenkins' dispute was made known to RJM at that time. Similarly, none of the letters sent to Jenkins contained any language requesting written acknowledgment of the debts (or otherwise provided a place for Jenkins' signature with the directive that the letter should be returned to RJM). Furthermore, if the N.C. General Assembly had intended a general collection letter to constitute a violation of *§ 58-70-115(1)*, then there would have been no reason to enact *Subsection 115(4)*, which prohibits "attempting to collect on a debt" the debt buyer knows is beyond the limitations period. [3] In sum, the enactment of *§ 58-70-115(1)* was meant to keep collection agencies from luring unsuspecting consumers into reviving the expired statute of limitations by obtaining written acknowledgments of time-barred debts. In this case, RJM did not threaten litigation or attempt to extend the statute of limitations by soliciting any written affirmation of the debt. For these reasons, as to the third

---

[1] On February 8, 2010, Jenkins filed for bankruptcy. RJM's collection system generated proofs of claims on the accounts despite being properly coded in RJM's system. (Doc. 43.) RJM immediately generated a claim withdrawal notice that was filed with the bankruptcy court on February 11, 2010. This action was inadvertent and non-prejudicial to Plaintiff. As such, it does not rise to the level of an attempt to collect.

[2] Jenkins also mistakenly argues that a partial payment and an "acknowledgment" as the term is used in N.C. GEN. STAT. § 58-70-115(1), are legally one in the same. A written acknowledgment and a partial payment can both re-start the statute of limitations, but this does not give them the same legal meaning. For partial payment to serve as a means of renewing the statute of limitations, a payment must have actually been made. *See Hewlett v. Schenck, 82 N.C. 234, 1880 WL 3158 (N.C.1880).* No payment was ever made to RJM by Jenkins. Therefore, this argument is without merit.

[3] Subsection 115(4) identifies the following conduct as an unfair debt collection practice:

> When the collection agency is a debt buyer or is acting on behalf of a debt buyer, bringing suit or initiating an arbitration proceeding against the debtor or otherwise attempting to collect on a debt when the collection agency knows, or reasonably should know, that such collection is barred by the applicable statute of limitations.

cause of [*14] action, Jenkins' motion for summary judgment is denied and RJM's motion for summary judgment is granted.

### 3. Fourth Cause of Action

Jenkins roots his fourth cause of action in _N.C. Gen. Stat. § 58-70-110_, which states [*15] "no collection agency shall collect or attempt to collect a debt or obtain information concerning a consumer by any fraudulent, deceptive, or misleading representation". Jenkins alleges that RJM violated this section because the credit reporting agency released Jenkins' report without an enumerated permissible purpose and would not have done so in the absence of a fraudulent, deceptive or misleading representation made by RJM. (Doc. 34.) This is a backdoor attempt, by Jenkins, to substantiate his factually inadequate accusations. _Section 58-70-110_ specifically lays out what would be considered fraudulent, deceptive and misleading representations, none of which can be applied to the actions undertaken by RJM. [4] RJM purchased the accounts which showed Jenkins as the account holder. RJM sent letters that offered settlements, but did not seek to have Jenkins acknowledge the debt in writing. [5] After a telephone conversation, RJM coded the accounts as "disputed" and no additional collection action was taken. Jenkins filed bankruptcy, which, in error, generated proofs of claims, and RJM withdrew those proofs of claims immediately. Given the aforementioned facts, RJM has done nothing deceptive [*16] or fraudulent, as defined by _§ 58-70-110(1-8)_, to Jenkins or regarding the accounts in dispute. Ultimately, Jenkins' fourth cause of action is not supported by the record; therefore, RJM's motion for summary judgment is granted and Jenkins' motion is denied.

### 4. Sixth Cause of Action

Jenkins' sixth cause of action is an attempt to receive double the damages for the same alleged violation. In essence, Jenkins' is using the inverse of his fifth cause of action and using a limited set of facts to make circular arguments regarding RJM's liability. As discussed earlier, RJM has not violated the FDCPA. Therefore, the allegation that RJM's violation of the FDCPA also violates _N.C. Gen Stat. § 58-70-115_ must fail. For this reason, with respect to the sixth cause of action, [*17] Jenkins' motion for summary judgment is denied and RJM's motion is granted.

### IV.

For the aforementioned reasons, there is no genuine dispute as to any material fact with respect to Jenkins' causes of action. RJM is entitled to judgment as a matter of law on all claims. Accordingly, Plaintiff's Amended Complaint will be dismissed in its entirety.

**IT IS THEREFORE ORDERED**, that Jenkins' Motion for Summary Judgment (Doc. 33) is **DENIED** and RJM's Motion for Summary Judgment (Doc. 42) is **GRANTED**.

Signed: February 14, 2013

/s/ Richard L. Voorhees

Richard L. Voorhees

United States District Judge

---

[4]   _See_ N.C. Gen. Stat. § 58-70-110 (1 - 8).

[5]   The new sections of N.C. Gen. Stat. § 58-70-115 are specifically not retroactive. Jenkins' Complaint makes clear that the collection activity in this matter was in or about March of 2009. Although the current law would have barred RJM's collection letter, the amended statute was not in place at the time of the collection efforts alleged and are therefore not applicable to this situation.

## *Johnson v. Capital One Bank*

United States District Court for the Western District of Texas, San Antonio Division

May 17, 2000, Decided ; May 19, 2000, Filed

Civil Action No. SA-00-CA-315-EP

**Reporter**
2000 U.S. Dist. LEXIS 13311; 2000 WL 1279661

SHAWN JOHNSON, Individually and on behalf of all others similarly situated, Plaintiffs, VS. CAPITAL ONE BANK and NCO FINANCIAL SYSTEMS, INC., Defendants.

**Disposition:** [*1] Defendants' motions to dismiss (Docket Nos. 19 and 21) GRANTED.

## Core Terms

collection, notice, motion to dismiss, lawsuit

## Case Summary

### Procedural Posture

Defendants filed motions to dismiss plaintiff's case that alleged that defendants violated state and federal law in their efforts to collect a debt.

### Overview

Plaintiff filed an action alleging that, by sending a letter in an effort to collect a debt, defendants violated state and federal law. Specifically, plaintiff complained that the language threatening future collection activity violated the Federal Fair Debt Collections Practices Act (FDCPA) because collection of the debt through the courts was now barred by the statute of limitations. Defendants filed motions to dismiss the complaint under *Fed. R. Civ. P. 12(b)(6)*. The court agreed with defendants that the debt collection notice at issue complied with *15 U.S.C.S. § 1692(g)*. The court could not have concluded that the language contained in the validation/collection letter could have formed the basis of a complaint under the FDCPA. A statute of limitations bar applied only to judicial remedies; it did not eliminate the debt. The collection language was neither harassing nor threatening. It simply stated that failure to challenge the debt would have resulted in further collection efforts. There was no mention of legal remedies or of any remedy that the creditor may not have legally pursued.

### Outcome

Motions to dismiss granted and the case dismissed; there was no harassing or threatening language in the collection letter, and the letter made no mention of legal remedies or of any remedy that the creditor may not have legally pursued.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

Civil Procedure > Dismissal > Involuntary Dismissals > Failure to State Claims

*HN1* Motions to dismiss for failure to state a claim are disfavored in the law, and a court will only rarely encounter circumstances that justify granting such a motion. A claim should not be dismissed upon such a motion unless it appears to a certainty (1) that no relief can be granted under any set of facts provable in support of its allegations, or (2) that the allegations, accepted as true, do not present a claim upon which relief legally can be obtained. This stringent standard mirrors the liberal provisions of the pleading requirements of *Fed. R. Civ. P. 8*, which allows for notice pleading, and which requires that pleadings be liberally construed as to do substantial justice.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

*HN2* For a notice pleading under *Fed. R. Civ. P. 8*, all that is required is a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

Banking Law > Consumer Protection > Fair Debt Collection > General Overview

Real Property Law > Landlord & Tenant > Tenant's Remedies & Rights > Fair Debt Collection Practices Act

*HN3* *15 U.S.C.S. § 1692(g)* requires debt collectors to provide consumers with detailed validation notices that include (1) the amount of the debt; (2) the name of the creditor; (3) a statement that the debt's validity will be assumed unless disputed within 30 days; and (4) an offer to verify the debt and provide the name and address of the original creditor at the request of the consumer.

Banking Law > Consumer Protection > Fair Debt Collection > General Overview

Governments > Legislation > Statute of Limitations > General Overview

Real Property Law > Landlord & Tenant > Tenant's Remedies & Rights > Fair Debt Collection Practices Act

*HN4* A statute of limitations bar applies only to judicial remedies; it does not eliminate the debt. Creditors are entitled to attempt to pursue even time-barred debts, so long as they comply with the rules of the Federal Fair Debt Collections Practices Act.

**Counsel:** For SHAWN JOHNSON, plaintiff: Ronald J. Johnson, Law Offices of Ronald J. Johnson, San Antonio, TX.

For SHAWN JOHNSON, plaintiff: Benjamin R. Bingham, Bingham & Lea, P.C., San Antonio, TX.

For CAPITAL ONE BANK, defendant: Michael C. Holmes, Fred I. Williams, Vinson & Elkins, L.L.P., Houston, TX.

For NCO FINANCIAL SYSTEMS, INC., defendant: George J. Petras, IV, Roger D. Hepworth, Henslee, Fowler, Hepworth & Schwartz, L.L.P., Austin, TX.

**Judges:** EDWARD C. PRADO, UNITED STATES DISTRICT JUDGE.

**Opinion by:** EDWARD C. PRADO

# Opinion

## ORDER

On this date the Court considered Defendants' motions to dismiss this case under *Federal Rule of Civil Procedure 12(b)(6)* and Plaintiff's response to those motions. After careful consideration, the Court will grant the motions.

## FACTS

On January 30, 1999, Defendant NCO Financial Systems, Inc., sent a notice to Plaintiff Shawn Johnson in an effort to collect a debt. The notice informed Plaintiff that Defendant Capital One Bank had recently purchased Johnson's nearly 20-year-old debt from Beall's Department Store and that Capital One had referred the debt to NCO for collection. [*2] The notice contained the following language: "If you choose not to respond to this notification, we will assign your account to a collector with instructions to liquidate the balance." The letter also states that payment "must" be sent to the included address. Plaintiff alleges that, by sending this letter, Capital One and NCO violated state and federal law in their efforts to collect the debt. The Defendants move to dismiss the complaint for failure to state a claim.

## Standard of Review

*HN1* Motions to dismiss for failure to state a claim are disfavored in the law, and a court will only rarely encounter circumstances that justify granting such a motion. *Mahone v. Addicks Util. Dist. of Harris County. 836 F.2d 921, 926 (5th Cir. 1988)*; *Clark v. Amoco Prod. Co., 794 F.2d 967, 970 (5th Cir. 1986)*. A claim should not be dismissed upon such a motion unless it appears to a certainty (1) that no relief can be granted under any set of facts provable in support of its allegations, or (2) that the allegations, accepted as true, do not present a claim upon which relief legally can be obtained. *Adolph v. Federal Emerg. Manag. Agency. 854 F.2d 732, 735 (5th Cir. 1988)*; [*3] *United States v. Uvalde Consol. Indep. School District, 625 F.2d 547, 549 (5th Cir. 1980)*, cert. denied, *451 U.S. 1002, 68 L. Ed. 2d 858, 101 S. Ct. 2341 (1981)*. This stringent standard mirrors the liberal provisions of the pleading requirements of *Federal Rule of Civil Procedure 8*, which allows for "notice" pleading, [1] and which requires that pleadings be liberally construed "as to do substantial justice." *Mahone, 836 F.2d at 926* (quoting *Fed. R. Civ. P. 8(f)*).

## Discussion

The Federal Fair Debt Collections Practices Act (FDCPA) was enacted to address the problem of debt collectors

---

[1] *HN2* All that is required is "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)* (quoting *Fed. R. Civ. P. 8(a)(2)*).

attempting to collect paid debts or attempting to collect debts by engaging [*4] in harassment and/or deceptive or unfair collection practices. Plaintiff complains that the Defendants violated this statute by misrepresenting the legal status of his debt. Specifically, Plaintiff complains that the language threatening future collection activity violates the statute because collection of the debt through the courts is now barred by the statute of limitations. Plaintiff also claims that the Defendants' conduct violated the Texas Deceptive Trade Practices Act and the Texas Finance Code.

The Court agrees with Defendants that the debt collection notice at issue here complies with **HN3** _15 U.S.C. § 1692(g)_, which requires debt collectors to provide consumers with detailed validation notices that include (1) the amount of the debt; (2) the name of the creditor; (3) a statement that the debt's validity will be assumed unless disputed within thirty days; and (4) an offer to verify the debt and provide the name and address of the original creditor at the request of the consumer. However, the notice sent to Plaintiff went beyond this language, and the Plaintiff contends that it is this extra verbiage that violates the FDCPA. The Court disagrees.

In _Kimber v. Federal Financial Corporation, 668 F. Supp. 1480 (M.D. Ala. 1987)_, [*5] the district court considered a claim that a debt collector had violated the FDCPA by threatening to sue the plaintiff on a time-barred debt. _Kimber, 668 F. Supp. at 1488_. The court found that, because the debt collector could not prevail in any lawsuit it did file on the claim, it was fraudulent in asserting that it would file a lawsuit.

_Kimber_ has been distinguished on its facts by the United States District Court of New Mexico in a case involving one of these Defendants. _See Shorty v. Capital One Bank, 90 F. Supp. 2d 1330 (2000)_. In _Shorty_, the court granted Capital One's motion to dismiss in a claim similar to that brought here, finding that the letter at issue in that case, which was sent to attempt to collect a time-barred debt, did not threaten the Plaintiff with a lawsuit or "even further collection actions." _Shorty_, No. CIV. 99-1018 IC/LFG, at 1. The court concluded that this fact, coupled with the fact that the debt validation notice faithfully tracked the requirements of section 1692g, mandated dismissal of the plaintiff's FDCPA lawsuit. _See also Aronson v. Commercial Fin. Servs., Inc., 1997 U.S. Dist. LEXIS 23534, 1997 WL 1038818 (W.D. Pa. 1997)_ [*6] (dismissal appropriate where there was no threat of future action against debtor).

Clearly, the case before the Court falls somewhere between _Kimber_ and _Shorty_. The letter sent to Plaintiffs does not threaten a lawsuit, but it does threaten future collection action. However, this Court cannot guess what sort of threats of "future collection activity" the _Shorty_ court envisioned when it suggested such threats might form the basis of a lawsuit. Nor was the question before the court in _Shorty_; there had been no threat. Therefore, the language is of little help here; certainly, it does not mandate a result, as the Plaintiff suggests.

Based on the reasoning of the cases cited to this Court, the Court cannot conclude that the language contained in the validation/collection letter here can form the basis of a complaint under the FDCPA. As those cases note, **HN4** a statute of limitations bar applies only to _judicial_ remedies; it does not eliminate the debt. Creditors are entitled to attempt to pursue even time-barred debts, so long as they comply with the rules of the FDCPA. The collection language here is neither harassing nor threatening. It simply states that failure to [*7] challenge the debt will result in further collection efforts. There is no mention of legal remedies or of any remedy that the creditor may not legally pursue. Nor does the Court any legal basis for concluding that the additional language here is misleading in formal or content.

The Court agrees that the cases cited by Plaintiff in support of his argument, where relevant at all, have relied on a misinterpretation of _Kimber_ and have not provided sound rationale for extending the _Kimber_ holding to cases where a creditor merely expresses its intent to pursue lawful attempts to collect an otherwise valid debt.

The Plaintiff has not stated a claim for which relief can be granted under the FDCPA. Therefore, his claims under the Texas Finance Code must also fail. Because Plaintiff is not a consumer as that term is defined by the Texas Deceptive Trade Practices Act, he has no claim under that statute. [2]

[*8] **Conclusion**

ACCORDINGLY, the motions to dismiss (Docket Nos. 19 and 21) are GRANTED.

SIGNED and ENTERED this 17th day of May, 2000.

EDWARD C. PRADO

UNITED STATES DISTRICT JUDGE

**JUDGMENT**

In accordance with this Court's Order of this same date, it is hereby ORDERED, ADJUDGED, and DECREED that

---

[2] As his claim under the DTPA essentially duplicated that brought under the Texas Finance Code, it is at any rate untenable.

ELIZABETH CALDCLEUGH

the Defendants' motions to dismiss are granted and this case is DISMISSED.

SIGNED and ENTERED this 17th day of May, 2000.

EDWARD C. PRADO

UNITED STATES DISTRICT JUDGE

ELIZABETH CALDCLEUGH

## *Mavilla v. Absolute Collection Serv.*

United States District Court for the Eastern District of North Carolina, Western Division

January 10, 2013, Decided; January 10, 2013, Filed

No. 5:10-CV-412-F

### Reporter

2013 U.S. Dist. LEXIS 3925; 2013 WL 140046

NARENDRA MAVILLA; and PADMAVATHI MAVILLA, Plaintiffs, v. ABSOLUTE COLLECTION SERVICE, INC.; and WAKEMED FACULTY PHYSICIANS, Defendants.

**Subsequent History:** Affirmed by *Mavilla v. Absolute Collection Serv., 539 Fed. Appx. 202, 2013 U.S. App. LEXIS 18803 (4th Cir. N.C., 2013)*

**Prior History:** *Mavilla v. Absolute Collection Serv., 2011 U.S. Dist. LEXIS 81657 (E.D.N.C., July 25, 2011)*

## Core Terms

furnisher, consumer, Plaintiffs', collection, disputed, notified, services, damages, lawsuit, notice, reinvestigation, deposition, bills, summary judgment motion, letters, Violations, days, partial summary judgment, summary judgment, debt collector, Default, parties, credit reporting, notification, allegations, inaccurate, reporting, telephone, charges, declaratory judgment

**Counsel:** [*1] For Narendra Mavilla, Padmavathi Mavilla, Plaintiffs: Christopher W. Livingston, Christopher W. Livingston, Esq., White Oak, NC.

For Absolute Collection Service, Inc., Defendant: Jennifer D. Maldonado, LEAD ATTORNEY, Yates McLamb & Weyher, Raleigh, NC; Sean T. Partrick, LEAD ATTORNEY, Yates, McLamb & Weyher, LLP, Raleigh, NC.

**Judges:** JAMES C. FOX, Senior United States District Judge.

**Opinion by:** JAMES C. FOX

## Opinion

### ORDER

This matter is before the court for ruling on cross-motions for summary judgment. Defendant, Absolute Collection Service ("ACS") [1] filed its Motion for Summary Judgment [DE-56] on July 30, 2012. The plaintiffs (collectively, "Mavillas") filed a Motion for Partial Summary Judgment [DE-58] on the same date. Both motions have been fully briefed and are ripe for disposition.

### I. Factual Background and Allegations

The short description of this litigation is as follows. WakeMed erroneously billed Mrs. Mavilla for medical services. [2] According to the Mavillas, they notified WakeMed that the bills were not theirs. Some or all of the services for which Mrs. Mavilla was billed were obstetrical [*2] services that she did not receive. In fact, she had undergone a voluntary sterilization procedure some years earlier before moving to North Carolina.

When payment was not forthcoming, WakeMed referred the matter to ACS in early April 2009, and ACS in turn attempted to collect the alleged debt. The Mavillas made a number of attempts to convince [*3] WakeMed and ACS that they did not incur the bills. Within about a week of ACS's receipt of the account from WakeMed and ACS's commencement of collection efforts, Wake Med provided

---

[1] The plaintiffs took a voluntary dismissal as against defendant WakeMed Faculty Physicians on January 14, 2011. See [DE-16].

[2] The medical services purportedly were rendered on June 13, 2005 ($126.00), June 30, 2005 ($54.00), and July 26, 2006 ($312.00). The Mavillas' pleadings discuss a 2003 statement, but it does not appear those charges were part of ACS's collection efforts. Indeed, an itemized WakeMed statement the Mavillas acknowledge they received in April 2009, reflects obstetrical services rendered and charged to her account on June 4 and June 22, 2003. The statement further reflects entries on December 11, 2003, stating, "REJ: Fee adjusted to max payable," following two Medicaid payments for the June 2003 services. The court has not identified in any of the "dunning letters" ACS sent to the Mavillas any reference to the 2003 charges. See also Mrs. Mavilla's letters to WakeMed dated July 21, 2009, and August 24, 2009. See Motion for Default Judgment [DE-10], Exh. 4.

copies of itemized statements for the purported debts to both ACS and the Mavillas. See Answer [DE-31], ¶ 19; Plaintiffs' Memorandum in Support of their Motion for Partial Summary Judgment [DE-58], p. 4 (alleging that ACS forwarded the itemized WakeMed statements to the Mavillas). Those itemized statements for three obstetrical services, which the plaintiffs allege WakeMed "fabricated," see id. p. 4, bore Mrs. Mavilla's correctly-spelled full name and address. See Plaintiffs' Motion for Default Judgment [DE-10], Exh. 2 (labeled "WakeMed bills 2009-04-06")

According to the Complaint, the Mavillas received collection, or "dunning," letter(s) on two occasions. See Complaint [DE-1], ¶¶ 14, 15 & 19 (three letters on April 14, 2009); ¶ 22 (three letters on June 3, 2009). They allege that ACS "began telephoning Plaintiffs numerous times in or around April 2009." Id. at ¶ 13. During her deposition, Mrs. Mavilla recalled that beginning around mid-April 2009, ACS called her house "almost every day." P. Mavilla Dep. [*4] [DE-57.B], p. 30; but see ACS's call logs contained in Exh. 1 to Plaintiffs' Motion [DE-58] ("Exhibit 21: ABS Collection Notes"). Sometimes she talked to the ACS representative but frequently she did not pick up the telephone when her caller-id indicated the call was from ACS. See id., pp. 37-38.

Initially, the Mavillas attempted to resolve the billing mistake through WakeMed, but they always were told that the information concerning the debt was correct; ACS's responses were similarly unsatisfactory. See, e.g., id. p. 39 ("even [ACS] didn't willing to listen my conversation, they told, 'No, you have to pay for the WakeMed those things, these things,' so one time - well, not one time, many times, they threatened, 'So it will affect your credit score and all of those things.' "). ³ Mrs. Mavilla testified, however, that ACS never threatened to file a civil lawsuit to collect the money. Id. p. 40.

The Mavillas continued to dispute the charges [*5] with both WakeMed and ACS, but ACS's collection efforts

continued until the Mavillas sent ACS a cease-communication letter on August 24, 2009, pursuant to 15 U.S.C. § 1692c(c). See Complaint [DE-1], p. 3 ¶ 26; Answer [DE-31], p. 4 ¶ 26; Exh. 4 to Motion for Default Judgment [DE-10]. After that date, no further collection letters are alleged to have been sent by ACS to the Mavillas, although the alleged debts remained unpaid.

At least by mid-November 2009, ACS's electronic interface software ("E-OSCAR") caused a report of the alleged delinquent accounts to be distributed to one or more of the credit reporting agencies ⁴ ("CRAs"), and the Mavillas were so notified by letter. ⁵ On or about December 28, 2009, the Mavillas "against their will" paid the two June 2005, bills ($54.00 and $126.00), totaling $180. Id., p. 6. The plaintiffs do not allege they paid the $312.00 July 26, 2006, bill.

Nearly a year later, in September 2010, the Mavillas did three things: they applied for and were denied a lower-interest loan to refinance their home, see Suppl. Memorandum to Motion for Default Judgment [DE-12] Exh. 2 (JP Morgan Chase Bank denial letter bearing "Score Date of 09/22/2010"); they applied for and were denied a Kohl's credit card, see id., Exh. 1 (Kohl's rejection letter dated 09/21/2010, referencing Experian credit report); and they purportedly notified "the credit bureaus" that they disputed the WakeMed/ACS charges and tradeline(s) associated therewith. The actual date on which the Mavillas disputed the debt(s) with the CRA(s) is not alleged in the Complaint, and the court has not been able to locate documentation of that date within the record. The Complaint alleges only,"Plaintiffs disputed the false tradelines with the credit reporting agencies." Id. ¶ 35. The record does reveal that ACS received notice [*7] that the debt(s) were in dispute from CRA Equifax on September 27, 2010. ⁶ See C. Mamfelt Dep. of March 13, 2012 [DE-57.C]. p. 58, ll. 22-23, & Dep. Exh. 21.

Five (5) business days later, the Mavillas, through counsel, initiated this lawsuit against both WakeMed [*8] and ACS,

---

³ For the Mavillas, English is a second language. During Mrs. Mavilla's deposition, her husband was permitted frequently to act as interpreter. This lawsuit does not suggest, however, that language barriers contributed to the parties' misunderstandings.

⁴ The "Big Three" CRAs are Experian, TransUnion, and Equifax. Because for purposes of this pending motions it is immaterial which one or more of the CRAs was involved in a particular transaction, the court often refers herein to "the CRA(s)."

⁵ The Complaint characterizes this November 17th letter as another [*6] "dunning" letter, although it quotes the letter as stating, "in pertinent part[,] 'Your delinquent account with WakeMed Faculty Practice has been reported to national credit bureaus as a result of your unwillingness to settle this account.' "Complaint [DE-1], p. 4 ¶ 29.

⁶ In their Memorandum [DE-59] supporting their Motion for Partial Summary Judgment, the plaintiffs state as an "undisputed fact" that "[o]n or about 26 September 2010, Plaintiffs disputed the ACS/WakeMed tradelines through the credit bureaus, who communicated the dispute to ACS through E-OSCAR, ACS's 'electronic interface that we have with the credit bureaus.' "Memorandum [DE-59], p. 7 ¶ 35. For this proposition, plaintiffs cite the March 13, 2012, deposition of ACS's Chief Operating Officer Christopher Mamfelt [DE-57.C]. p. 58, ll. 22-23. The transcript of that deposition reveals that Mamfelt was testifying from plaintiffs' Exhibit 21, referencing

ELIZABETH CALDCLEUGH

see Complaint [DE-1], filed October 4, 2010 - almost a year after they received notification that the disputed debts had been reported to the CRAs and after the Mavillas had paid two of the three disputed "fabricated" debts. That Complaint alleges the two dates of the dunning letters the Mavillas received from ACS in April and June 2009, see id. ¶¶ 14,15, & 19, and the dates on which Mrs. Mavilla wrote to WakeMed and ACS disputing the debts, see id. ¶ 25, as well as the date of ACS's letter notifying her that the debt had been reported to the CRA(s), see id. ¶ 26.

Although the Complaint does not allege when or how it occurred, the Mavillas state in their Memorandum that "sometime after 04 October 2010," (the date on which the Complaint was filed,) WakeMed notified ACS that the subject debts did not belong to the Mavillas and ACS closed the account at the CRAs. See Memorandum [DE-59], p. 8 ¶ 42. For this "uncontested fact," the Mavillas again cite ACS's Christopher Mamfelt's deposition, p. 69, lines 3-6. In fact, there is no reference at that point in the transcript as to when WakeMed notified ACS of the mistake - whether before or after the Complaint was filed. See Kenneth [*9] Perkins' Affidavit [DE-23], Attach. 1 (when WakeMed alerted ACS to the mistake, ACS "immediately removed the credit reporting from the Plaintiffs' credit agency files;" see also C. Mamfelt Dep. of June 14, 2012 [DE-57.D], pp. 19-20; 25 (CRA entries were deleted at WakeMed's request)). The Mavillas further contend that ACS and/or WakeMed wrongfully retained the $180 that they unwillingly paid in December 2009. [7]

Although on the face of the record, the plaintiffs' own filings undermine certain facts essential to a prima facie showing on the FDCA claim, the Mavillas seek [*10] about $300,000.00 in statutory, compensatory, and punitive damages, together with attorney's fees and costs against ACS for purported violations of the FAIR CREDIT REPORTING Act ("FCRA"), 15 U.S.C. § 1681, et seq. (Count I); the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et seq. (Count IV); the North Carolina Collections Agency Act ("NCCAA"), N.C. GEN. STAT. §§ 58-70-95(3), 58-70-110(4) and 58-70-115(1) (Count III); [8] and for Declaratory Judgment (Count V) that Mrs. Mavilla owes ACS nothing. The Mavillas concede that they may not recover on their Count II claim under the North Carolina Debt Collection Act, and have voluntarily dismissed that count. [9]

## II. Standard of Review

Summary judgment is appropriate if the moving party demonstrates there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must view the evidence and all reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

A fact is material if, under the applicable substantive law, it is essential to the proper disposition of the claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. See id.

The moving party bears the initial burden of demonstrating an absence of a genuine [*12] issue of material fact and that it is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.

the date on which ACS employee "Vickie Garrett - RECEIVED DISPUTE VERIFICATION FROM E-OSCAR; VERIFIED AS REPORTED; PAID," which was on September 27, 2010. There is no mention of an alleged date on when the plaintiffs notified the CRA(s) that they disputed the debt/tradeline(s) at issue.

[7]    Mamfelt, testified during his second deposition that ACS did not keep any money it collected from the Mavillas. See C. Mamfelt Dep. of June 14, 2012 [DE-57.D], p. 30. Further, an exhibit appended to the Mavillas' Memorandum supporting their Motion for Default Judgment [DE-11], Exh. 3 (labeled by plaintiffs as "Exhibit 7, ACS Credit Reports Showing False Debt on EQ, TU, EX") bears the following notation in the Negative Accounts section concerning the $126.00 and $54.00 debts, "WakeMed Faculty Practice Paid Collection." The exhibit is undated but states, "balance date" as "01/2010" for each of the two $0 balance accounts.

[8]    Over the Mavillas' vehement opposition, ACS was permitted to file a supplement to its motion for summary judgment, adding as a ground for relief that the Mavillas' state law claims are preempted by federal law. See Order [DE-77]. It is unnecessary to reach the preemption argument.

[9]    The Mavillas also filed a state court action, Mavilla v. WakeMed Faculty Practice Plan, No. 12-CVS-802 (Wake County Superior Court), under N.C. GEN. STAT. § 75-50, et seq., (North Carolina Debt Collection Act) arising from these same facts, [*11] on January 17, 2012, while this action was pending. They had taken a voluntary dismissal of an identical state lawsuit a year earlier (2011) because they had failed to serve the proper WakeMed entity. That 2012 state action was dismissed following an August 1, 2012, summary judgment hearing. See Transcript of Hearing, [DE-63-2]; Order [DE-63-3].

*Ed. 2d 265 (1986)*. In meeting that standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the other party's claim, but simply must point out to the court that the other party lacks evidence on an essential element of its claim. See *id. at 325*.

Once the movant has met this initial burden, the burden of production then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson, 477 U.S. at 256*. The nonmoving party may not simply rest upon its allegations to satisfy its burden. See *id*. Rather, the nonmoving party must "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant. *Fed. R. Civ. P. 56(e)*; see *Lujan v. National Wildlife Fed'n, 497 U.S. 871,888-89, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)*; *Celotex, 477 U.S. at 324*; *Anderson, 477 U.S. at 248*. To do so, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein. See *Fed. R. Civ. P. 56*.

Finally, summary [*13] judgment no longer is regarded as a "disfavored procedural shortcut." Instead, summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex, 477 U.S. at 327* (quoting *Fed. R. Civ. P. 1*).

### III. Discussion and Analysis

ACS seeks summary judgment as to all claims contained in the Complaint. The Mavillas acknowledge that they cannot recover on Count II; as it was alleged as against WakeMed only and WakeMed has been dismissed as a defendant. The Mavillas seek partial summary judgment against ACS on Counts I, III, and IV,

> as to liability and [FCRA] minimum damages of $80,589 actual, $2,000 statutory for violating FDCPA, and $196,100 statutory for violating NCCAA, total at least $278,689.00 ..., together with court filing fees of $800, costs of suit and attorney fees to be finalized later, and such other and further relief that this Court deems just and proper.

Plaintiffs' Memorandum [DE-59], p. 18.

#### A. Count I - Violations of the FCRA

1. *Statutory Scheme and Basic Legal Underpinning*

The complexity of the wording and the structure of the FCRA has been the subject of numerous court opinions, more than one of which has commented [*14] on the near impossibility of a consumer comprehending it unaided by an expert.

> Congress purportedly enacted [the FCRA] to protect consumers. Its stated purpose is to "require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." *15 U.S.C. § 1681(b)*. Yet cases like this one lead the Court to wonder how Congress could have possibly believed that the FCRA would carry out those functions. It is of little value to ordinary consumers, in part due to the fact that it is hopelessly complex—the statute is drafted in hyper-technical language and includes a sufficient number of internal cross-references to make even the most dedicated legal practitioner consider a change in career. But the FCRA's substance is even more troubling than its complex form. The statute includes numerous provisions that limit consumers' ability to enforce its mandates either by explicitly barring private actions or by imposing such burdensome procedural requirements [*15] that no layperson could possibly be expected to comply.

*Burrell v. DFS Services, LLC, 753 F. Supp. 2d 438, 444 (D.N.J. 2010)*.

Nevertheless, "we begin with the understanding that Congress 'says in a statute what it means and means in a statute what it says there.' " *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000)* (internal quotations omitted). "Where" 'the statute's language is plain, "the sole function of the courts" ... is to enforce it according to its terms.' " *Id.* (internal citations omitted). The court, therefore, must assess the Mavillas' FCRA claims in keeping with the plain, albeit convoluted, terms of that statute.

The court deems it impractical to attempt explanation of the operation of this statutory scheme by quoting the Act itself. In light of its contorted structure, maddening cross-references, and use of similar-sounding terms for entirely different concepts or entities, a narrative description is far more effective.

a. External references

One of the more helpful opinions is that of Circuit Judge Karen Nelson Moore in *Boggio v. USAA Federal Savings Bank, 696 F.3d 611 (6th Cir. 2012)*. Judge Moore's "III. FCRA Analysis" specifically is recommended [*16] for a background of the content and application of relevant portions of the FCRA. See *id. at pp. 614-18*. Also illuminating is Chi Chi Wu & Elizabeth DeArmond, FAIR CREDIT REPORTING (7th ed. 2011) (hereinafter "FAIR CREDIT REPORTING"), Ch. 6, "*Activities and Duties of Furnishers of Information,*" and particularly § 6.10.1.1 & § 6.10.1.2, p. 249 ("A consumer who fails to initiate the dispute with the CRA under *section 1681i* and instead deals directly with the furnisher, whether informally or formally through a furnisher direct dispute, cannot invoke any FCRA remedies whatsoever. *Private consumer enforcement is only available for a breach of the section 1681s-2(b) furnisher obligations triggered by a formal section 1681i(a) dispute with a CRA . . .*") (footnotes omitted) (emphasis added).

b. FCRA narrative

i. *Duty of furnisher to provide accurate and complete information to CRA*

Furnishers of credit information (like ACS) have a duty to provide accurate and complete information to the CRAs in the first place pursuant to *§ 1681s-2(a)(1)(A)*. The prohibition on a furnisher's supplying information to a CRA it knows or has reasonable cause to believe is inaccurate is stated in *§ 1681s-2(a)(1)(A)*. Additionally, [*17] a furnisher who has been notified by the consumer that specific information is inaccurate, and that information, in fact, is inaccurate, may not then furnish that information to a CRA. See *§ 1681s-2(a)(1)(B)*.

If a CRA receives a dispute from a consumer, it must initiate a "reasonable investigation" which includes notifying the information's furnisher of the dispute within five (5) days of receiving the dispute, see *§ 1681i(a)(2)(A)*. The CRA must ascertain the accuracy of the disputed information, record the current status of the information or delete it from its file within thirty (30) days of notice of the dispute. There is *no private right of action* to remedy an alleged breach by the furnisher to provide correct and complete consumer credit information to a CRA under *§ 1681s-2(a)*. See *§ 1681s-2(c)(1)*. See, e.g., *Longman v. Wachovia Bank, N.A., ___ F.3d ___, 702 F.3d 148, 2012 U.S. App. LEXIS 25930, 2012 WL 6604538, slip op. at *3 (2d Cir. Dec. 19, 2012)*; *SimmsParris v. Countrywide Fin. Corp. 652 F.3d 355, 358 (3d Cir. 2011)* (no private right of action under *§ 1681s-2(a)*); *Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142, 149 (4th Cir. 2008)* (same).

ii. *Duty of furnisher to reinvestigate and correct following proper* [*18] *notice from CRA*

However, when it receives notice from a CRA of a dispute pursuant to *§ 1681i(a)(2)(A)*, a furnisher must initiate its own reinvestigation of the information, which must include investigating the disputed information, reviewing all relevant information provided by the CRA under *§ 1681i(a)(2)*, and reporting the results of the investigation to the reporting CRA; if information found to be inaccurate or incomplete or cannot be verified, (i) reporting results to all other CRAs to which the furnisher provided that information, and (ii) modifying, deleting or permanently blocking reporting of that information. See *§ 1681s-2(b)(1)*; see also *Saunders, 526 F.3d at 148*. This furnishers' duty to conduct a reinvestigation and make appropriate reports and corrections or deletions must be completed within thirty (30) days of receiving notice of the dispute from a CRA. See *§ 1681s-2(b)(2)*; see also *Moore v. Equifax Information Servs., LLC, 333 F. Supp. 2d 1360, 1366 (N.D. Ga. 2004)* (explaining that, upon notice of a dispute, furnishers are required "to conduct to conduct an investigation with respect to the disputed information, review all relevant information provided by the consumer [*19] reporting agency, and report the results of the investigation to the consumer reporting agency.").

*A furnisher's duty to investigate does not arise for purposes of a consumer private right of action under § 1681s-2(b)* unless and until a CRA notifies the furnisher of a dispute. See *Brown v. Wal-Mart Stores, Inc., No. 11-6049, 2012 U.S. App. LEXIS 25122, 2012 WL 6051957, slip. op. at *4 (6th Cir. Dec. 6, 2012)*; *Saunders, 526 F.3d at 150*. Only after this notice requirement is met does a consumer plaintiff have standing to bring a claim under *subsection (b)* against a furnisher that failed after proper notice by the CRA to make a timely reinvestigation, report and correction. See, e.g., *Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d 1138, 1147 (10th Cir. 2012)*; *SimmsParris, 652 F.3d at 359 (3d Cir. 2011)*; *Chiang v. Verizon New England Inc., 595 F.3d 26, 35 (1st Cir. 2010)*; *Mazza v. Verizon Washington DC, Inc., 852 F. Supp. 2d 28, 35 (D.D.C. 2012)*; *Ilodianya v. Capital One Bank USA, NA, 853 F. Supp. 2d 772, 774 (E.D. Ark. 2012)*; *Sweitzer v. Am. Express Centurion Bank, 554 F. Supp. 2d 788, 795 (S.D. Ohio 2008)* ("[A] *§ 1681s-2(b)(1)* violation is triggered only upon a consumer reporting agency providing notice to the [*20] furnisher of information"); *Stafford v. Cross Country Bank, 262 F. Supp. 2d 776, 784 (W.D. Ky. 2003)* ("[A] furnisher of credit information, such as the Bank, has no responsibility to investigate a credit dispute until after it receives notice from a consumer reporting agency. Under the statutory language, notification from a consumer is not enough.").

ELIZABETH CALDCLEUGH

It is only for a breach of this duty of reinvestigation and correction under § 1681s-2(b) that a consumer may bring a private civil lawsuit against a furnisher of information, pursuant to the FCRA. See, e.g., Fair Credit Reporting at § 6.10.1.1 & § 6.10.1.2, pp. 249. The legal theories available for a private right of action by a consumer against a furnisher pursuant to § 1681s-2(b) are stated in § 1681n (negligent noncompliance) and/or § 1681 o (willful noncompliance).

### iii. *Breach*

By definition, no breach can occur unless and until a person fails to comply - either negligently or intentionally - with a duty imposed on him. The burden to prove a breach of duty is on the party alleging it, who also must prove as an element of his claim that he suffered compensable injury proximately caused by the breach. These legal requirements are so fundamental  [*21] as to require no citation.

Willful violations of the FCRA require proof that the furnisher knowingly and intentionally committed an act in conscious disregard for the rights of others, but a plaintiff need not show malice or evil motive. See § 1681n; see also, e.g., *Bruce v. First U.S.A. Bank, Nat. Ass'n, 103 F. Supp. 2d 1135, 1144 (E.D. Mo. 2000)* (citing *Bakker v. McKinnon, 152 F.3d 1007, 1013 (8th Cir. 1998)*; *Cushman v. TransUnion Corp., 115 F.3d 220, 226 (3d Cir. 1997)* (a defendant's actions must be on the same order as willful concealments or misrepresentations to justify punitive damages)).

### 2. *The Parties' Basic Contentions*

The gravamen of the Mavillas' allegations in Count I is that ACS negligently and/or willfully furnished false information about them to CRAs and falsely verified a debt to the CRA(s), all resulting in actual and statutory damages, as well as punitive damages under the FCRA. In support of its motion for summary judgment as to that claim, ACS contends, first, that the Mavillas did not comply with statutory requirements that they first notify the CRAs of the disputed debt. Next, ACS points out that the Mavillas instituted this lawsuit against ACS before it had time  [*22] to conduct a reasonable investigation after receiving proper notice from a CRA. Finally, ACS argues, the Mavillas have failed to demonstrate they suffered injuries as a consequence of ACS's alleged non-compliance.

### 3. *The Mavillas' Evidence and Theory*

The several memoranda filed herein by plaintiffs' counsel contain various statements of their theory of liability which is that ACS's mere reliance on WakeMed's computer-generated referrals of unpaid debts for collection was unreasonable in the face of Mrs. Mavilla's repeated denials that she received the underlying medical services. For example, after listing the duties of furnishers set out in § 1681s-2(b)(1)(A), plaintiffs' counsel argues,

> ACS did none of these things, even though it is unreasonable to credit a bare invoice for obstetric services instead of a woman's statement that she had no children then, and even though any reasonable investigation would have shown Mrs. Mavilla's alleged debts to have been biologically impossible.

Plaintiffs' Response Memorandum [DE-64], p. 10 (citing "SUF 1-2, 14"); see also id. p. 5 ("Failing or refusing to credit a woman's word as to when she did or did not bear children is patently unreasonable.").  [*23] With all due respect to the Mavillas, their lawyer's theory cannot trump the specific requirements of federal debt collection law as applied to the facts that are established by the competent documentary evidence of record.

### 4. *Analysis*

The court has conducted an extensive review of those documents of record, including exhibits and deposition transcripts the parties have filed in support of their cross-motions for summary judgment, together with exhibits the Mavillas filed herein early in the litigation when they sought entry of default judgment. The court also has examined and reexamined the Mavillas' pleadings and memoranda of record, and has taken care to compare these documents with the matters of record appropriately considered under *Federal Rule of Civil Procedure 56(e)* and with the specifically applicable portions of the FCRA. Having done so, the court holds with confidence that the Mavillas have not carried their burden either to prevail on their Motion for Partial Summary Judgment [DE-58], or to resist ACS's Motion for Summary Judgment [DE-56].

### a. Unreasonable investigation

The short explanation is this: the record contains no documentation of if, when or how the Mavillas' provided  [*24] notice to the CRA(s) to trigger the CRA(s)' notification to ACS on September 27, 2010, that the subject debts were disputed. Nevertheless, that ACS in fact received such CRA notice on that date is uncontested, and therefore establishes that ACS's duty to reinvestigate and correct under § 1681s-2(b) did not arise until **September 27, 2010.** By law,

ACS had *thirty (30) days* after receiving notice of the dispute from a CRA within which to investigate and correct any incomplete or inaccurate information ACS had provided to the CRA(s). *See, e.g., Sweitzer, 554 F. Supp. 2d at 795* ("[G]enerally, liability for a *15 U.S.C. § 1681s-2(b)* violation arises 30 days after the furnisher of information does not comply with its obligations outlined in *§ 1681s-2(b)(1)(A)-(D)*") (citing *15 U.S.C. §§ 1681s-2(b)(2), 1681i(a)(1)-(2)*). Thirty calendar days from September 27, 2010, was October 27, 2010.

Whether or not ACS breached a duty that arose on September 27th must be determined as of the date on which the Mavillas filed this lawsuit for damages allegedly resulting from that breach. The lawsuit was filed on Monday, October 4, 2010, see Complaint [DE-1], the fifth business day from the date on which ACS's [*25] duty arose. The court's task in ruling on the cross-motions for summary judgment as to Count I is to determine whether the Mavillas have demonstrated they have competent evidence by which they can prove each element of their *prima facie* FDCA claim(s), including that ACS breached a duty after it arose, and by that breach, proximately caused compensable injury to the Mavillas.

As noted above, the Mavillas have demonstrated that ACS's duty to reinvestigate and correct had been triggered by the CRA's notice of dispute on September 27, 2010. In order to determine whether the Mavillas have forecast evidence sufficient to prove that ACS had breached that duty on or before Monday, October 4, 2010, the court has perused the record and the parties' memoranda carefully but has not located evidence, competent under *Rule 56(e)*, to support a determination that the plaintiffs can demonstrate a breach by ACS between September 27, 2010, and October 4, 2010. Indeed, pursuant to the statutory scheme under which the Mavillas chose to sue, they instituted this lawsuit when ACS still had 23 days remaining before its 30-day reinvestigation and correction deadline expired. See *§ 1681s-2(b)(2)*.

Although the [*26] statute does not describe what would be a "reasonable investigation" the furnisher's burden is limited by what information is provided in the CRA's notice to it that there is a customer dispute. See *§ 1681s-2(b)(1)(B),(C)* (furnisher must review all relevant information *provided by the CRA pursuant to § 1681i(a)(2)* notice, then report the results to the CRA). The Mavillas have not identified the evidence by which they would demonstrate that the dispute Notice ACS received from the CRA included details of Mrs.

Mavilla's physiological capacity to have received the services for which the debt allegedly was incurred. The record indicates that the CRA, through its E-OSCAR electronic notification system, simply alerted ACS that the reported delinquent debts were in dispute. *See* C. Mamfelt Dep. of March 13, 2012 [DE-57.C], p. 58, ll. 22-23, referencing entries in Exhibit 21 (designated by plaintiffs' counsel as ACS's "Collection Notes") recording "Vickie Garrett - RECEIVED DISPUTE VERIFICATION FROM E-OSCAR; VERIFIED AS REPORTED; PAID."

Moreover, the evidence the Mavillas produced herein on its face demonstrates that their application to refinance their home and their application for a Kohl's [*27] credit card had been rejected *before* ACS's duty arose on September 27, 2010. [10] Therefore, the Mavillas cannot prove they suffered damages as a proximate result of a breach of duty that had not yet arisen. *See, e.g., Ruffin-Thompkins v. Experian Info. Solutions, Inc., 422 F.3d 603, 608 (7th Cir. 2005)* (stating that "[w]ithout a causal relation between the violation of the statute and a loss of credit, or some other harm, a plaintiff cannot obtain an award of actual damages"); *Nagle v. Experian Info. Solutions, Inc. 297 F.3d 1305, 1307 (11th Cir. 2002)* (holding that the failure of a plaintiff to produce evidence of damages resulting from an FCRA violation mandates summary judgment).

b. False Verification

The Mavillas also contend they suffered damages by virtue of ACS "falsely verifying the tradelines." Again, evidence of record reflects that upon receipt of notification from the CRA(s) of the credit dispute, ACS on September 28, 2010, [*28] again contacted WakeMed to inquire about the validity of the debts and again was assured by WakeMed that the information provided was correct. ACS then reported back to the CRA(s) that the debt was valid. On several occasions, Christopher Mamfelt's confirmed that procedure during his two depositions. *See, e.g.,* C. Mamfelt Dep. of June 14, 2012, [DE-57.D], p. 16 ("We would research it, contact the client, which we did in this case, and the client told us that the charged that were placed with us for Ms. Mavilla were her charges and we continued our collection activity."); C. Mamfelt Dep. of March 13, 2012, [DE-57.C], p. 34 ("Again, in this case and what I know of this case, we had two occasions where WakeMed confirmed that the charges were for Mrs. Mavilla, the placement of that account and the itemized bill for that account.").

It is the Mavillas' position, however, that in order to comply with the FCRA, ACS should have conducted a more

---

10  *See* Exh. 2 to Plaintiffs' Suppl. Memorandum to Motion for Default Judgment [DE-12] (JP Morgan Chase Bank denial letter bearing "Score Date of 09/22/2010"); see id., Exh. 1 (Kohl's rejection letter dated 09/21/2010, referencing Experian credit report).

thorough reinvestigation including, but not limited to, obtaining Mrs. Mavilla's medical records to render an independent determination of the physiological feasability that Mrs. Mavilla's explanation was true, such that the obstetrical bills could not [*29] have been incurred by her. Plaintiffs' counsel argued that, had ACS *really* made proper inquiry,

> WakeMed would also have told ACS that Mrs. Mavilla informed it in writing that she had her tubes tied in October 2001, inspiring doubt in any reasonable person. ACS could and should then have requested Mrs. Mavilla's actual medical records, not just the easily faked invoices, detailing the billed-for services and signed by the physical or other professional who provided care. ACS could and should also have credited Plaintiffs' entirely truthful denials of liability. This was not a credit card or furniture loan - this was alleged childbirth, which no woman would lie about.

Plaintiffs' Response [DE-64], p. 6. As noted above, the reasonableness of a reinvestigation by a furnisher is determined in light of "all relevant information *provided by*" the CRA under *§ 1681i(a)(2)*. *See supra*, page 16, citing *§ 1681s-2(b)(1)(B)*. The Mavillas have identified no evidence that the notifying CRA supplied any information other than what appeared in its electronic notification via E-OSCAR. Plaintiffs' counsel's suggestion that ACS should have examined a pathology report concerning Mrs. Mavilla's sterilization [*30] procedure in 2001, [11] see C. Mamfelt Dep. of June 14, 2012 [DE-57.D], pp. 21-23, is unsupported by any source counsel has cited.

At bottom, however, whether or not ACS's reinvestigation was "reasonable" under the FCRA is not capable of proof, because the Mavillas filed this lawsuit more than twenty days before ACS was required by law to perform. In other words, the FCRA claim was filed prematurely, at best.

It is no secret that the perverse complexity of the FCRA defies facile comprehension [*31] or compliance by "mere consumers" - notwithstanding its declared purpose - and the Mavillas are not faulted for not having done so. It recently has been observed that,

> [i]n order to effectively keep a creditor from distributing inaccurate information, consumers must submit disputes not to the credit card companies and other creditors with which they regularly interact, but to credit reporting agencies—obscure third parties with which they are unlikely to be familiar .... [T]he FCRA places the burden of ensuring the efficient functioning of the credit reporting system on the consumers themselves - laypeople who are, in most cases, in no position to carry out that task by jumping over the technical hurdles created by the statute. Such a scheme is troubling, to say the least.

*Burrell, 753 F. Supp. 2d at 445-46*. Nevertheless, except for a provision enabling a CRA to terminate a reinvestigation that it determines is frivolous or irrelevant, see *§ 1681i(a)(3)*, and the "opportunity for the furnisher to save itself from liability by taking the steps required by *§ 1681s-2(b)*," Congress put no limit on private enforcement under *§§ 1681n* and *o*." *Nelson v. Chase Manhattan Mortgage Corp., 282 F.3d 1057, 1060 (9th Cir. 2002)*.

The [*32] facts of this case are poignantly illustrative of the likely inability of most consumers to avoid inaccurate credit information from being reported to CRAs and from furnishers delaying correcting of such information once it is reported. Yet, this is the statutory scheme, procedure and detailed requirements enacted by Congress in full effect during the entire period relevant to this lawsuit which persists to this date. The court is not free to ignore the plain statutory requirements.

## 5. *Summary*

For the foregoing reasons, the court concludes that there are no genuine issues of material fact whether the Mavillas' purported damages are recoverable under the FCRA. See FED. R. CIV. P. 56(e); *Lujan, 497 U.S. at 888-89* (nonmoving party must "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant). Rather, the record reveals no evidence that ACS breached any duty it owed to the Mavillas, and the evidence that does exist demonstrates that the Mavillas' loss of credit opportunities was not

---

[11]   The Mavillas contend they forward copies of a 2001 pathology report to "both WakeMed and ACS on or about 21 July 2009 to let them know that she had been in another state in 2003 and sterile since 2001, and demanded that ACS cease communication." Plaintiffs' Memorandum in Support of Default Judgment [DE-11], p. 2. Attached to that Memorandum as Exhibit 1 is the "Pathology Report" from El Camino Hospital, Mountain View, California, and email correspondence between Mrs. Mavilla and plaintiffs' counsel on October 1, 2010, attaching an email she received from the North Carolina Department of Health & Human Services on August 28, 2009, stating "we could find nothing to connect you to any Medicaid coverage."

proximately caused by any post September 27, 2010, violation by ACS of the FCRA. Accordingly, ACS's Motion for Summary [*33] Judgment [DE-56] is ALLOWED as to Count One. The Mavillas' Motion for Partial Summary Judgment [DE-58] is DENIED as to Count One.

B. Count II - Violations of N.C. Debt Collection Act, N.C. GEN. STAT. Ch. 75, Art. 2

The Mavillas concede that ACS is exempt from the provisions of the NCDCA. Accordingly, ACS's Motion for Summary Judgment [DE-56] is ALLOWED as to Count Two.

C. Count IV - Violations of the Fair Debt Collection Procedures Act, 15 U.S.C. § 1692, et seq.

The Mavillas contend in Count IV that ACS violated the federal Fair Debt Collection Procedures Act ("FDCPA"), 15 U.S.C. 1692, et seq. Specifically, they contend that ACS violated §§ 1692e(2)(A), (5) and (10), and 1692f. According to the Complaint, the factual bases for these allegations are ACS's telephone calls and dunning letters directed to the Mavillas attempting to collect the subject WakeMed debts.

To prevail on a claim pursuant to the FDCPA, a plaintiff must allege and prove that (1) she was the object of collection activity arising from a consumer debt, as defined by the FDCPA; (2) the defendant is a debt collector as defined by the FDCPA; and (3) the defendant engaged in an act or omission prohibited by the FDCPA. See Johnson v. BAC Home Loans Servicing, LP, 867 F. Supp. 2d 766, 776 (E.D.N.C. 2011). [*34] At first glance, it seems Mrs. Mavilla would satisfy at least the first two elements, but in fact, it is her position that the sums ACS attempted to collect were not consumer debts at all, but were charges that WakeMed and/or ACS fabricated in an attempt to extort money from the Mavillas and/or to ruin their credit ratings.

Assuming, however, without so deciding, that the Mavillas could satisfy the first two elements, they have failed to forecast evidence by which they can prove the third. The acts ACS allegedly performed were placing telephone calls and sending letters to the Mavillas between April 2009 and August 2009, and ("falsely report[ing] both the $54 account and the $126 account as paid collection items on Mrs. Mavilla's consumer credit reports."). See Complaint at ¶¶ 13-15, 19, 22, 28-31.

The Mavillas' Response Memorandum [DE-64], lists half a dozen subsections of § 1692e they believe were violated by ACS, see id., pp. 16-17, but their Complaint alleges violations only of §§ 1692e(2)(A), (5) and (10), in addition to § 1692f. See Complaint [DE-1] ¶¶ 18, 21, 24, 33.

Subsection (2)(A) of § 1692e provides that a debt collector may not make a false representation of "the character, [*35] amount, or legal status of any debt." It appears to be the plaintiffs' position that "collecting a false debt is per se" violative of § 1692e(2)(A). Plaintiffs' Response [DE-64] p. 16. The Mavillas have not identified by what conduct or to whom ACS made a "false representation of the character, amount or legal status of any debt" in connection with the collection of any debt within the one-year statute of limitations applicable to § 1692e. To the extent the plaintiffs would rely on ACS's allegedly "falsely report[ing] both the $54 account and the $126 account as paid collection items on Mrs. Mavilla's consumer credit reports," it is uncontested that the Mavillas in fact did pay those bills in December 2009, as a result of ACS's collection efforts.

Subsection (5) of § 1692e provides that a debt collector may not threaten "to take any action that cannot legally be taken or that is not intended to be taken." The Mavillas allege in the Complaint that ACS violated subsection e(5) by threatening to bring civil lawsuits against them to collect the fake debt beyond expiration of the statute of limitations. See Complaint [DE-1] ¶ 16. However, Mrs. Mavilla admitted in her deposition that ACS [*36] did not threaten to file a lawsuit to collect the disputed debts, see P. Mavilla Dep. [DE-57.B] pp. 39-40. There are no threats of civil litigation contained in any correspondence from ACS that the plaintiffs have revealed in support of their position. Moreover, expiration of the statute of limitations to file a lawsuit to recover a debt does not prevent a collector from attempting to collect it by other lawful means.

Subsection e(10) prohibits a debt collector from using "any false representation or deceptive means to collect or attempt to collect any debt." It is not apparent from the Complaint or the Mavillas' memoranda exactly what conduct by which they intend to prove ACS violated subsection e(10), although they explain in their Memorandum filed in support of their Motion for Partial Summary Judgment [DE-59],

> [a]s already thrashed to death supra, ACS's conduct and communications were false and deceptive from the get-go, meriting maximum financial pain in return. No reasonable jury could award less then $1,000 on such evidence. Tragically, FDCPA's maximum statutory damage limit of $1,000 per plaintiff per defendant results in only another $2,000 for Plaintiffs.

Id. p. 16. Nevertheless, [*37] Mrs. Mavilla conceded during

her deposition that, had ACS questioned WakeMed about the accuracy of the debts it referred for collection, ACS probably would have received the same response the Mavillas received from WakeMed - that the bills correctly were charged to the Mavillas, see P. Mavilla Dep. [DE-57.B], pp. 59-60.

The Mavillas also contend ACS violated *§ 1692f*, which provides that a debt collector "may not use unfair or unconscionable means to collect or attempt to collect any debt." That section then provides a non-exhaustive list of specific conduct that would constitute a violation. While it is not apparent what acts by ACS the Mavillas intend to use to a prove ACS's violation of *§ 1692f*, they state,

> ACS correctly observes that collecting time-barred debts is not on the specific list underneath, but incorrectly leaves out an important sentence in between. 'Without limiting the general application of the foregoing, the following conduct is a violation of this section...'. Congress really should correct the oversight, but no matter, collecting stale debt without full disclosure to the consumer is unconscionable.

Plaintiffs' Memorandum in Response [DE-64], p. 17.

While the court [*38] has found it impossible to determine from the Complaint or memoranda the specific factual bases upon which the Mavillas rely in alleging ACS violated the alleged subsections of *§ 1692*, it is apparent that they rely heavily on the strict liability nature of the law, see Plaintiffs' Memorandum in Support [DE-59], p. 15-17 (quoting *Warren v. Sessoms & Rogers, P.A., 676 F.3d 365, 375 (4th Cir. 2012)*), in tandem with their position that ACS cannot prevail on its "bona fide error" affirmative defense.

The "bona fide error" defense is statutory. *Section 1692k(c)* provides that, "A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." The Mavillas contend that ACS has not produced any evidence that it acted without intending to cause them to pay a debt they had not, in fact, incurred. They argue that ACS has failed to produce any documents to prove that they maintained appropriate internal

training procedures and failed to explain "which FDCPA [*39] provisions are taught in its alleged compliance program." Memorandum in Response [DE-59], p. 16.

The Mavillas fail to recognize that ACS's burden to demonstrate it can prove an affirmative defense does not arise unless or until they, as plaintiffs, demonstrate they can offer evidence constituting a *prima facie* FDCPA claim. It is not a violation of the FDCPA for a debt collector to seek payment of an alleged debt by making telephone calls and writing letters that do not violate the law. Indeed, the Mavillas did not allege that ACS violated *§ 1692e(8)* ("causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number"). Nor is it a violation to report a delinquent debt to a CRA in compliance with applicable laws and regulations, and the court has determined, above, that the plaintiffs have not carried their burden under *Rule 56* to survive ACS's motion for summary judgment.

The court's careful scrutiny of the Complaint, together with the deposition transcripts of record, memoranda and supporting exhibits, has failed to discover any evidence identified by the Mavillas of actionable [*40] conduct by ACS under the FDCPA. Although plaintiffs' counsel makes scathing accusations and sweeping proclamations of "corporate hooliganism" against ACS, the actual evidence plaintiffs have produced demonstrates simply that ACS representatives repeatedly called the Mavillas and continued to do so despite the Mavillas' verbal protestations that the debts were not theirs, and that ACS directed two sets of "dunning" letters to the Mavillas seeking, with escalating insistence, that they pay the "fabricated" WakeMed bills, until the Mavillas issued a written cease and desist demand on August 24, 2009. After that date, the only written communication ACS directed to the Mavillas was its letter in November 2009, notifying them that it had reported the alleged delinquent debts to the CRA(s). [12] See Complaint at ¶ 26, 29. There being an insufficient showing by the plaintiffs that they can produce evidence constituting a prima facie case under the FDCPA, ACS has no obligation to forecast evidence of an affirmative defense thereto. Accordingly, ACS's Motion for Summary Judgment [DE-56] is ALLOWED as to Count IV.

D. Count III - Violations of N.C. Collection Agencies Act, N.C. GEN. STAT. Ch. 58. Art. 70

---

[12]   At this point, the Mavillas could have notified ACS that they disputed the accuracy [*41] or completeness of the negative information it reported to the CRAs, which notification would have prevented ACS from further reporting that information to a CRA without noting that the information was disputed. See *15 U.S.C. § 1681s-2(a)(3)*. Instead, the Mavillas paid two of the three alleged debts.

ELIZABETH CALDCLEUGH

The Mavillas seek in Count III to collect damages pursuant to North Carolina's Collection Agencies Act ("NCCAA"). They specifically cite *N.C. Gen. Stat. §§ 58-70-95(3)*, *58-70-110(4)*, and *58-70-115(1)*, which they claim entitle them to statutory damages under *§ 58-70-130* per violation. This claim is supplemental to the federal claims that conferred original federal jurisdiction in this court, and all such federal claims have been dismissed. Accordingly, the court declines to exercise supplemental jurisdiction over the Mavillas' supplemental NCCAA claim. See *28 U.S.C. § 1367(a)*, *(c)*, and Count III therefore is DISMISSED. ACS's Motion for Summary Judgment [DE-56] as to Count III is DENIED as moot.

E. Count IV - Declaratory Judgment

In another federal civil action in this district court prosecuted by the [*42] same attorney who represents the Mavillas here, Chief Judge James C. Dever, III, wrote, "[plaintiffs'] claim for declaratory relief must be dismissed. The relief he requests is not the type of action contemplated by the Declaratory Judgment Act." *Edwards v. Santander Consumer USA, Inc., No. 5:10-CV-424-D, 2011 U.S. Dist. LEXIS 64040, 2011 WL 2457498, slip op. at *6 (E.D.N.C. June 15, 2011)*. In the *Edwards* case, prior litigation conclusively had established that the plaintiff did not owe the subject debt. See id.

Here, it has been uncontested since near the date the Complaint was filed that the WakeMed billing had been a mistake and that the plaintiffs owed neither WakeMed nor ACS any money thereon. "Therefore, a declaratory judgment from this court would not provide certainty, security, or alleviate controversy." *Id.*, citing *United Capitol Ins. Co. v. Kapiloff, 155 F.3d 488, 493 (4th Cir. 1998)*. Indeed, the Declaratory Judgment Act confers discretion on the district court, "[i]n a case of actual controversy . . . [to] declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Id.*, citing *28 U.S.C. § 2201* (emphasis added).

In [*43] determining whether an actual controversy exists, the basic inquiry is whether the conflicting contentions of the parties present a real, substantial controversy between parties having adverse legal interests, with a definite and concrete dispute, and not one which is hypothetical or abstract. *Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979)*. Declaratory relief may not be granted on a moot claim. *Nestler v. Bd. of Law Exam'rs of the State of N.C., 611 F.2d 1380, 1382 (4th Cir. 1980)*. Only in exceptional circumstances will a court hear a claim that is "capable of repetition, yet evading review." *Los Angeles v. Lyons, 461 U.S. 95, 109, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)*. The availability of future damages actions precludes a finding that such exceptional circumstances exists. See *Alvarez v. Smith, [558 U.S. 87, 93-94], 130 S.Ct. 576, 581, 175 L. Ed. 2d 447 (2009)*.

*Edwards, 2011 U.S. Dist. LEXIS 64040, supra, slip op. at *5*. Here, as in *Edwards*, dismissal is appropriate because "the matter [that Mrs. Mavilla does not owe ACS any money] is not in controversy." *Id.*: see also C. Mamfelt Dep. of March 13, 2012 [DE-57.C], p. 89,11. 12-17:

MR. PARTRICK (ACS's counsel): Right. We expect those [answers to requests for admission] to be revised, but I'll just [*44] state right here that they're going to - 37, "Plaintiff owes you nothing," will be revised to say, "Admitted"; 38, "Plaintiffs owe nothing to any of your clients"; response, "Denied" will be revised to say, "Admitted."

Accordingly, the court declines to exercise its discretion under the Declaratory Judgment Act, and ALLOWS ACS's Motion for Summary Judgment [DE-56] as to Count V.

III. Conclusion

For the reasons exhaustively set forth herein, ACS's Motion for Summary Judgment [DE-56] is ALLOWED. The Mavillas' Motion for Partial Summary Judgment [DE-58] is DENIED. The Clerk of Court is DIRECTED to enter judgment accordingly.

SO ORDERED. This, the 10th day of January, 2013.

/s/ James C. Fox

JAMES C. FOX

Senior United States District Judge

## *Price v. M.R.S. Assocs.*

United States District Court for the Eastern District of North Carolina, Southern Division

June 27, 2014, Decided; June 27, 2014, Filed

No. 7:13-CV-13-D

**Reporter**

2014 U.S. Dist. LEXIS 87803; 2014 WL 2930723

KEITA EUGENA PRICE, Plaintiff, v. M.R.S. ASSOCIATES, INC., Defendant.

## Core Terms

collection, time-barred, summary judgment motion, statute of limitations, collection agency, summary judgment, state-law, contends, unfair, unconscionable, disclosing, acknowledgment, nonmoving, agency's, alleges

**Counsel:** [*1] For Keita Eugena Price, Plaintiff: Christopher W. Livingston, LEAD ATTORNEY, Christopher W. Livingston, Esq., White Oak, NC.

For M.R.S. Associates, Inc., a New Jersey corporation, Defendant: Brooks Freeman Bossong, Thomas J. Ludlam, LEAD ATTORNEYS, Nexsen Pruet, PLLC, Greensboro, NC; Cindy D. Salvo, The Salvo Law Firm, P.C., West Caldwell, NJ.

**Judges:** JAMES C. DEVER III, Chief United States District Judge.

**Opinion by:** JAMES C. DEVER III

## Opinion

### ORDER

On December 3, 2012, Keita Eugena Price ("Price" or "plaintiff") filed a complaint against M.R.S. Associates, Inc. ("MRS") and Vital Recovery Services, Inc. ("Vital") (collectively, "defendants") in Bladen County Superior Court, alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), *15 U.S.C. §§ 1692-1692p*, and the North Carolina Collection Agency Act ("NCCAA"), *N.C. Gen. Stat. §§ 58-70-1 to 58-70-155*. Compl. [D.E. 1-3]. Defendants removed the case to this court. [D.E. 1]; see *28 U.S.C. §§ 1331, 1441*; *15 U.S.C. § 1692k(d)*. On July 24, 2013, Price voluntarily dismissed her complaint with

prejudice as to Vital. [D.E. 27]; see *Fed. R. Civ. P. 41(a)(1)*. On October 31, 2013, MRS moved for summary judgment [D.E. 28, 32]. On November 25, 2013, Price responded [*2] in opposition [D.E. 30]. On December 19, 2013, MRS replied [D.E. 36]. As explained below, the court grants MRS's motion for summary judgment on Price's federal-law claims and on one of her state-law claims, and remands the other state-law claim.

I.

On September 29, 2007, Price obtained a loan from Wells Fargo Bank, N.A. ("Wells Fargo") to buy a vehicle for personal, household, or family use. See Compl. ¶ 6; Perkins Aff. [D.E. 29-1] ¶ 5 & Ex. B. On March 27, 2009, thieves stole Price's vehicle and used it as transportation during a crime spree. See Compl. ¶¶ 7-8. The police recovered the vehicle, but the thieves had damaged it significantly, greatly reducing its value. See id. ¶¶ 9-10. Price alleges that she made her last payment on the vehicle no later than March 7, 2009. See id. ¶ 11.

On May 24, 2011, Wells Fargo retained MRS to collect Price's debt. See id. ¶ 13; Perkins Aff. ¶ 5. MRS sent a letter to Price, and made several phone calls to her, in order to collect the debt. See Compl. ¶ 14; Perkins Aff. ¶ 8. Price contends that she received at least twenty calls from March 8, 2012, through June 15, 2012. See Price Aff. [D.E. 11-1] ¶ 3. "To stop MRS's illegal harassment," Price retained [*3] an attorney, who sent MRS a cease-communication letter. Compl. ¶ 18; see Price Aff. ¶ 6; [D.E. 11-1] 3. Price did not hear from MRS again. See Price Aff. ¶ 7.

On December 3, 2012, Price filed a complaint against MRS. Price alleges that MRS attempted "to collect a time-barred debt without disclosing what rights [she] would be giving up by acknowledging the debt . . . [or] making a part payment on the debt" in violation of *15 U.S.C. § 1692f* and *N.C. Gen. Stat. § 58-70-115(1)*. Compl. ¶ 17. Price also alleges that MRS engaged in collection activity without holding the required permit from the North Carolina

2014 U.S. Dist. LEXIS 87803, *4

Commissioner of Insurance, in violation of *15 U.S.C. § 1692f* and *N.C. Gen. Stat. § 58-70-115*. See Compl. ¶ 15. MRS seeks summary judgment on Price's claims [D.E. 28, 32].

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. In evaluating a motion for summary judgment, the court views the evidence and the inferences drawn from that evidence [*4] in the light most favorable to the nonmoving party. See *Tolan v. Cotton, 134 S. Ct. 1861, 1863, 188 L. Ed. 2d 895 (2014)* (per curiam); *Scott v. Harris, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)*.

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. See *Celotex, 477 U.S. at 325*. That is, the moving party must show the existence of a "dispute[] over [a] fact[] that might affect the outcome of the suit under the governing law." *Anderson, 477 U.S. at 248*. Once the moving party has met its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (emphasis and quotation omitted). The nonmoving party must do more than present a "scintilla of evidence" in its favor. *Anderson, 477 U.S. at 252*. Rather, the nonmoving party must present "sufficient evidence" such that reasonable jurors could find for it. *Id. at 249*. Accordingly, a court may grant summary judgment if the nonmoving party's evidence is "merely colorable" or "not significantly probative." *Id. at 249-50*.

A.

The court first addresses Price's claims regarding MRS's alleged [*5] attempt to collect time-barred debt. In North Carolina, the statute of limitations for "a contract, obligation[,] or liability arising out of a contract" is three years. *N.C. Gen. Stat. § 1-52(1)*. Price contends that she made her last payment on the vehicle no later than March 7, 2009, and that the statute of limitations for her debt expired on March 7, 2012. See Compl. ¶¶ 11-12; Price Aff. [D.E. 11-1] ¶ 2. Price also contends that MRS called her at least twenty times between March 8, 2012, and June 15, 2012 to attempt to collect her time-barred debt. See Compl. ¶ 16; Mem. Opp'n Mot. Summ. J. 2; Price Aff. ¶ 3. Price claims

that MRS violated *15 U.S.C. § 1692f* and *N.C. Gen. Stat. § 58-70-115(1)* by "attempt[ing] to collect a time-barred debt without disclosing what rights [she] would be giving up by acknowledging the debt[,] and [without disclosing] that making a part payment on the debt would restart the statute of limitations [and amount] to an admission that [she] owed the debt." Compl. ¶ 17.

MRS seeks summary judgment on two grounds. First, MRS contends that it did not attempt to collect a time-barred debt. See Mem. Supp. Mot. Summ. J. 4. MRS claims that Price made her last payment [*6] on the vehicle on October 24, 2009, and that the statute of limitations for her debt thus expired on October 24, 2012. See id. In support, MRS cites the payment history for Price's account, which Wells Fargo gave to MRS upon retaining MRS to collect the debt Price owed. See Perkins Aff. Ex. C. The payment history shows that seven payments—all via Money Gram—were made on Price's account after March 7, 2009, the last one on October 24, 2009. See id. MRS also claims that it ceased its efforts to collect Price's debt on May 11, 2012, well before the statute of limitations expired. See Mem. Supp. Mot. Summ. J. 3. It cites its own account history in support of this claim. See Perkins Aff. Ex. D. Alternatively, MRS maintains that even if it did attempt to collect a time-barred debt, it did not violate either *15 U.S.C. § 1692f* or *N.C. Gen. Stat. § 58-70-115(1)*. See Mem. Supp. Mot. Summ. J. 4-6.

In response, Price presents no evidence to discredit the Wells Fargo payment history. Rather, she relies solely on her own affidavit, in which she states that she made her last payment on the vehicle no later than March 7, 2009. See Price Aff. ¶ 2. Price contends that her affidavit is sufficient to create [*7] a factual dispute defeating MRS's motion for summary judgment. Mem. Opp'n Mot. Summ. J. 3.

The court need not resolve this issue. Even if MRS did attempt to collect a time-barred debt, it did not violate either *15 U.S.C. § 1692f* or *N.C. Gen. Stat. § 58-70-115(1)*. As for Price's federal-law claim, the FDCPA does not prohibit a collection agency from requesting payment on a time-barred debt, even if the collection agency does not disclose that the debt is time-barred and that any partial payment or acknowledgment would result in the debt's revival, as long as in doing so, the collection agency does not threaten or commence litigation. See, e.g., *Freyermuth v. Credit Bureau Servs., Inc., 248 F.3d 767, 771 (8th Cir. 2001)*; *Jenkins v. RJM Acquisitions, LLC, Civil Action No. 5:10CV27-RLV, 2013 U.S. Dist. LEXIS 20133, 2013 WL 589006, at *3 (W.D.N.C. Feb. 14, 2013)* (unpublished); *Mavilla v. Absolute Collection Serv., Inc., No. 5:10-CV-412-F, 2013 U.S. Dist. LEXIS 3925, 2013 WL 140046, at *12 (E.D.N.C. Jan. 10,*

*2013)* (unpublished); *Reed v. AFNI, Inc., No. 2:09-CV-459 TS, 2011 U.S. Dist. LEXIS 3600, 2011 WL 112430, at \*2 (D. Utah Jan. 13, 2011)* (unpublished); *Wallace v. Capital One Bank, 168 F. Supp. 2d 526, 528 (D. Md. 2001)* (collecting cases). After all most statutes of limitations [*8] (including North Carolina's) bar the remedy of suit, but do not extinguish the debt itself. *See, e.g., Freyermuth, 248 F.3d at 771; Wallace, 168 F. Supp. 2d at 528; cf. Davis v. Mills, 194 U.S. 451, 456, 24 S. Ct. 692, 48 L. Ed. 1067 (1904); Simonton v. Clark, 65 N.C. 525, 526 (1871); Mrozek v. Mrozek, 129 N.C. App. 43, 46, 496 S.E.2d 836, 839 (1998)*. Price does not show—indeed, she does not even allege—that MRS threatened or commenced litigation. Accordingly, the court grants MRS's motion for summary judgment on Price's claim that MRS violated *15 U.S.C. § 1692f* by attempting to collect time-barred debt.

As for Price's state-law claim, Price proceeds under *N.C. Gen. Stat. § 58-70-115(1)*, which prohibits a collection agency from "seeking or obtaining . . . an acknowledgment of any debt barred by the statute of limitations, or a waiver of any legal rights of the debtor[,] without disclosing the nature and consequences of such affirmation or waiver and the fact that the consumer is not legally obligated to make such affirmation or waiver." Although Price alleges that MRS "attempt[ed] to collect a time-barred debt without disclosing what rights [she] would be giving up by acknowledging the debt," Compl. ¶ 17, she does [*9] not allege that MRS ever sought or obtained an acknowledgment from her in any form, much less the written acknowledgment needed to renew an expired statute of limitations in North Carolina. See *N.C. Gen. Stat. § 1-26* ("No acknowledgment or promise is evidence of a new or continuing contract, from which the statutes of limitations run, unless it is contained in some writing signed by the party to be charged thereby . . . ."); *Jenkins, 2013 U.S. Dist. LEXIS 20133, 2013 WL 589006, at \*4-5; George W. Helm Co. v. Griffin, 112 N.C. 356, 356, 16 S.E. 1023, 1024 (1893)*. Moreover, Price provides no evidence on this point in opposition to MRS's motion for summary judgment. Accordingly, the court grants MRS's motion for summary judgment on Price's claim that MRS violated *N.C. Gen. Stat. § 58-70-115(1)* by attempting to collect a time-barred debt.

B.

The court next addresses Price's claims regarding MRS's permit. Under North Carolina law, a collection agency must first secure a permit from the Commissioner of Insurance before engaging in any debt-collection activity in the state. See *N.C. Gen. Stat § 58-70-1*. Engaging in debt-collection activity in North Carolina without a permit subjects the collection agency to criminal penalties. [*10] See id. According to Price, MRS lacked a permit when it attempted to collect the debt she owed to Wells Fargo. See Compl. ¶ 4. Price contends that a collection agency that operates without a permit in violation of *N.C. Gen. Stat. § 58-70-1* collects or attempts to collect debt by the use of an "unfair practice," in violation of *15 U.S.C. § 1692f* and *N.C. Gen. Stat. § 58-70-115*. See Compl. ¶ 15.[1]

MRS seeks summary judgment on these claims because it maintains that it holds a valid permit to collect debt in North Carolina. See Mem. Supp. Mot. Summ. J. 3-4. MRS claims that it operated as the entity that Price sued—M.R.S. Associates, Inc.—only [*11] until 2008, that it has since changed its name to MRS BPO, LLC ("MRS BPO"), and that MRS BPO has a permit to collect debt in North Carolina. See id. In support, MRS offers the affidavit of William Michael Perkins ("Perkins"), the Quality Assurance Manager for MRS BPO. See Perkins Aff. ¶ 1. Perkins bases his knowledge of MRS BPO's permit status on "[a] simple internet search of the North Carolina Department of Insurance website," id. ¶ 4, and attaches to his affidavit a printout from that website showing that MRS BPO holds a valid permit to collect debt in North Carolina. See Perkins Aff. Ex. A [D.E. 29-2].

In response, Price claims that, contrary to Perkins's declaration, M.R.S. Associates, Inc. and MRS BPO are separate entities. See Mem. Opp'n Mot. Summ. J. 10. She offers evidence of her own internet search in support: two printouts from the North Carolina Department of the Secretary of State's website showing that M.R.S. Associates, Inc. and MRS BPO are separate, active corporations in North Carolina, each with its own Secretary of State Identification ("SOSID") number. See [D.E. 30-3]. MRS does not address Price's claim, or her evidence, in its reply.

Viewing the evidence in the light [*12] most favorable to Price, the court concludes that a reasonable jury could find that MRS did not hold the required permit when it attempted to collect Price's debt. Nonetheless, this factual dispute about MRS's permit status does not "affect the outcome of

---

[1]  In her memorandum in opposition to MRS's motion for summary judgment, Price claims for the first time that MRS violated *15 U.S.C. §§ 1692e(5)* and *(10)* by attempting to collect Price's debt without a permit. See Mem. Opp'n Mot. Summ. J. 6. Price cannot add these claims to her complaint via summary-judgment briefing. *See, e.g., Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009)* (collecting cases); *Swann v. Source One Staffing Solutions, 778 F. Supp. 2d 611, 622-23 (E.D.N.C. 2011)*. Thus, the court does not consider the arguments.

[Price's] suit under . . . governing [federal] law." *Anderson, 477 U.S. at 248.*

Price contends that MRS violated *15 U.S.C. § 1692f*, the FDCPA's prohibition on a collection agency's use of "unfair practices," by failing to comply with *N.C. Gen. Stat. § 58-70-1*, the NCCAA's permit requirement. See Compl. ¶ 15. Sometimes a violation of the NCCAA may support a federal cause of action under the FDCPA. See, e.g., *LeBlanc v. Unifund CCR Partners, 601 F.3d 1185, 1190 (11th Cir. 2010)*; *Bradshaw v. Hilco Receivables, LLC, 765 F. Supp. 2d 719, 729 (D. Md. 2011)*; see also *Myers v. Sessoms & Rogers, P.A., 781 F. Supp. 2d 264, 269 (E.D.N.C. 2011)*. Debt collection practices in violation of state law, however, do not "per se" violate the FDCPA. *Wade v. Reg'l Credit Ass'n, 87 F.3d 1098, 1100 (9th Cir. 1996)*; see *Carlson v. First Revenue Assurance, 359 F.3d 1015, 1018 (8th Cir. 2004)* ("The FDCPA . . . was not meant to convert every violation of a state [*13] debt collection law into a federal violation."); *Smith v. LVNV Funding, L.L.C., 894 F. Supp. 2d 1045, 1050 (E.D. Tenn. 2012)* (collecting cases). Accordingly, a collection agency that collects or attempts to collect any debt without a required state permit does not necessarily use "unfair or unconscionable means" in violation of *15 U.S.C. § 1692f*. See, e.g., *LeBlanc, 601 F.3d at 1200*; see also *Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC, 480 F.3d 470, 473 (7th Cir. 2007)* (declining "to use [section] 1692f to enforce other legal rules [under the] theory that it is 'unfair' or 'unconscionable' for a debt collector to violate any other rule of positive law"). At best, a collection agency's failure to comply with state permit requirements is "an appropriate consideration in deciding whether [a collection agency's] 'means' of collection were 'unfair or unconscionable.'" *LeBlanc, 601 F.3d at 1200* (quoting *15 U.S.C. § 1692f*); cf. *Bradshaw, 765 F. Supp. 2d at 729*. Another appropriate consideration, of course, is the collection agency's chosen means themselves. Put differently, without evidence that an unlicensed entity's letters, telephone calls, or other collection efforts were in any [*14] way unfair or unconscionable, the court is left with an allegation of a per se violation—which is insufficient to survive a motion for summary judgment. See, e.g., *Wade, 87 F.3d at 1100 & n.2*.

Price has not shown how MRS's failure to comply with North Carolina's permit requirement made its chosen means of collecting her defaulted debt—namely, sending a letter and calling multiple times—unfair or unconscionable. See *LeBlanc, 601 F.3d at 1200*. Indeed, Price does not even recount what MRS stated in the letter it sent to her, or what MRS representatives said in any telephone conversations with her. Without such evidence, a reasonable jury could not conclude that MRS's letter or telephone conduct was "unfair or unconscionable" "in either a legal or lay sense." *Wade, 87 F.3d at 1100-01 & n.2*. Accordingly, the court grants MRS's motion for summary judgment on Price's FDCPA claim based on MRS's alleged violation of *N.C. Gen. Stat. § 58-70-1*.

Price also contends that MRS violated *N.C. Gen. Stat. § 58-70-115*, the NCCAA's prohibition on a collection agency's use of "unfair practices," by failing to comply with *N.C. Gen. Stat. § 58-70-1*, the NCCAA's permit requirement. See Compl. ¶ 15. This issue [*15] is one of first impression in North Carolina.

The court has granted summary judgment for MRS on Price's federal-law claims, and on one of Price's state-law claims. Thus, the only remaining issue is one of state law. The remaining state-law claim, however, raises a novel question of North Carolina law. Accordingly, the court declines to exercise supplemental jurisdiction over the remaining state-law claim, and remands the claim to Bladen County Superior Court. See *28 U.S.C. § 1367(c)(1), (3)*; *Waybright v. Frederick Cnty., 528 F.3d 199, 209 (4th Cir. 2008)*; *Farlow v. Wachovia Bank of N.C., N.A., 259 F.3d 309, 316-17 (4th Cir. 2001)*; *Thompson v. Prince William Cnty., 753 F.2d 363, 365 (4th Cir. 1985)*.

II.

In sum, the court GRANTS MRS's motion for summary judgment [D.E. 28, 32] on Price's federal-law claims and on one of Price's state-law claims. The court declines to exercise supplemental jurisdiction over Price's state-law claim concerning *N.C. Gen. Stat. § 58-70-115* and *§ 58-70-1* and REMANDS this claim to Bladen County Superior Court. The clerk shall close the case.

SO ORDERED. This 27 day of June 2014.

/s/ James C. Dever

JAMES C. DEVER III

Chief United States District Judge

MICHAEL JONES

## *Reed v. AFNI, Inc.*

United States District Court for the District of Utah, Central Division

January 13, 2011, Decided; January 13, 2011, Filed

Case No. 2:09-CV-459 TS

**Reporter**
2011 U.S. Dist. LEXIS 3600; 2011 WL 112430

LARRY REED, Plaintiff, vs. AFNI, INC. and TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA, Defendants.

## Core Terms

collection, summary judgment, debt collector, consumer, verification, argues, identity theft, disputed, verifying, lawsuit

**Counsel:** [*1] For Larry Reed, Plaintiff: Brian W Steffensen, LEAD ATTORNEY, STEFFENSEN LAW OFFICE, SALT LAKE CITY, UT.

For AFNI, Defendant: Gabriel K. White, Phillip S. Ferguson, LEAD ATTORNEYS, CHRISTENSEN & JENSEN PC, SALT LAKE CITY, UT; James K. Schultz, LEAD ATTORNEY, PRO HAC VICE, SESSIONS, FISHMAN, NATHAN & ISRAEL, CHICAGO, IL.

For Travelers Casualty & Surety Company of America, Defendant: Gabriel K. White, LEAD ATTORNEY, CHRISTENSEN & JENSEN PC, SALT LAKE CITY, UT.

**Judges:** TED STEWART, United States District Judge.

**Opinion by:** TED STEWART

## Opinion

MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on cross motions for summary judgment. For the reasons discussed below, the Court will grant Defendants' Motion and deny Plaintiff's Motion.

I. BACKGROUND

The facts of this case are largely undisputed. In late 2003, Plaintiff Larry Reed was the victim of identity theft. As part of that crime, the thief opened an account for cell phone service in Plaintiff's name with T-Mobile. In January 2009, T-Mobile placed that account for collection with Defendant Afni. At the time the account was placed, T-Mobile provided Afni with the [*2] name of the consumer, an address and phone number to contact the consumer, the account number, and the amount of the outstanding balance.

After the account was placed, Afni sent a letter to the person identified by T-Mobile as the responsible party, Larry Reed (the "February 11, 2009 letter").[1] Plaintiff first became aware that there was a T-Mobile account in his name with an outstanding balance when he received the February 11, 2009 letter. The February 11, 2009 letter from Afni contained the disclosures required by the Fair Debt Collection Practices Act.

In response to the February 11, 2009 letter, Plaintiff sent correspondence disputing the debt and requesting the debt be verified.[2] Specifically, Plaintiff stated that he had not, at any time, maintained an account with T-Mobile or used any of its services.[3] There is no mention of Plaintiff being the victim of identity theft in the letter.

---

[1] Docket No. 21, Ex. C.

[2] *Id.*, Ex. D.

[3] *Id.*

Afni sent a second letter to Plaintiff on March 18, 2009 (the "March 18, 2009 letter") verifying the debt.[4] The March 18, 2009 letter confirmed that the account was in Plaintiff's name, that the name of the creditor was T-Mobile, provided the address of the original [*3] creditor, the balance due, the nature of the debt, and the dates of service from which the balance arose.[5] The March 18, 2009 letter also included a copy of the T-Mobile bill from the original creditor.[6]

After sending the March 18, 2009 letter, Afni did not send Plaintiff any further correspondence. Moreover, Afni did not call Plaintiff. Plaintiff did not dispute the debt with T-Mobile. Afni never told Plaintiff that it was going to file a lawsuit to collect the account, though Plaintiff asserts that such a threat can be implied from the letters. Afni did not file a lawsuit against Plaintiff to collect the debt.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[7] In considering whether genuine issues of material fact exist, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[8] The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[9]

## III. DISCUSSION

Plaintiff's claims, as clarified by the cross motions for summary judgment, are as follows: (1) Afni violated the Fair Debt Collection Practices Act ("FDCPA") by misrepresenting the amount and character of the debt by attempting to collect from the wrong debtor; (2) Afni unlawfully attempted to collect a debt after the statute of limitations period had expired; (3) Afni failed to properly verify the debt and continued its collection efforts without first verifying the debt; and (4) Afni violated the Utah Consumer Sales Practices Act ("UCSPA") by attempting to collect on a time-barred debt Plaintiff never owed. The Court will discuss each of these claims below.

## A. MISREPRESENTATION OF THE AMOUNT AND CHARACTER OF THE DEBT

*15 U.S.C. § 1692e(2)(A)* provides that a debt collector may not falsely represent the character, amount, or legal status of any debt. *Section 1692e(10)* prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect [*5] any debt or to obtain information concerning a consumer."[10]

Plaintiff contends that Afni violated the FDCPA by attempting to collect a debt that was not his. Courts have held "that the allegation that the debt sought to be collected is not owed, standing alone, cannot form a basis for a 'false and misleading practices' claim under the FDCPA."[11] Further, in *Mammen v. Bronson & Migliaccio, LLP,*[12] the court, facing a similar factual scenario, rejected a false representation claim from an identity theft victim.[13] The Court agrees with the reasoning set out in these cases and, therefore, rejects Plaintiff's claims that Afni violated the FDCPA by merely seeking to collect on a debt Plaintiff allegedly did not owe.

## B. COLLECTION OF A DEBT AFTER THE STATUTE OF LIMITATIONS

---

[4] *Id.,* Ex. E.

[5] *Id.*

[6] *Id.*

[7] *See **Fed.R.Civ.P. 56(a)**.*

[8] *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986);* [*4] *Clifton v. Craig, 924 F.2d 182, 183 (10th Cir. 1991).*

[9] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Wright v. Southwestern Bell Tel. Co., 925 F.2d 1288, 1292 (10th Cir. 1991).*

[10] *15 U.S.C. § 1692e(10).*

[11] *Bleich v. Revenue Maximization Group, Inc., 233 F.Supp. 2d 496, 500 (E.D.N.Y. 2002).*

[12] *715 F.Supp. 2d 1210 (M.D. Fla. 2009).*

[13] *Id. at 1220; see also Richeson v. Javitch, Block & Rathbone, LLP, 576 F.Supp. 2d 861, 867-68 (N.D. Ohio 2008)* (rejecting claim under *15 U.S.C. § 1692e(10)* from plaintiff alleging that he was the victim of identity theft).

Plaintiff argues that Afni violated the FDCPA by attempting [*6] to collect a time barred debt. As an initial matter, the Court need not decide whether the limitations period on the underlying debt has expired. Even finding that the limitations period had expired, the Court finds that Afni's actions here did not violate the FDCPA.

As numerous cases provide, a debt collector is permitted to collect on a debt after the statute of limitations has expired, provided that those efforts do not include the threat or actual filing of a lawsuit.[14] Here, there is no evidence that Defendant threatened a lawsuit and Defendant never filed a lawsuit. Plaintiff suggests that the threat of a lawsuit may be implied from the letters sent by Afni, but the Court cannot find such an implication in the letters. Therefore, the Court finds that Afni is entitled to summary judgment on this claim.

## C. VERIFICATION OF THE DEBT AND CONTINUED COLLECTION

Plaintiff also takes issue with Afni's verification of the debt and the actions taken by Afni after the debt was disputed by Plaintiff.

15 U.S.C. § 1692g(b) provides that, in the event a consumer disputes any portion of a debt being collected, "the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment . . . and a copy of such verification or judgment . . . is mailed to the consumer by the debt collector."[15] The statute does not detail what information must be included in the verification. However, courts have held that "verification of a debt involves nothing more than the debt collector confirming in writing that the amount being demanded is what the creditor is claiming is owed; the debt collector is not required to keep detailed files

of the alleged debt."[16] Debt collectors do not have to vouch for the validity of the underlying debt.[17] "Moreover, the FDCPA did not impose upon them any [*8] duty to investigate independently the claims presented by [the debtor]."[18]

The Tenth Circuit recently agreed with the Fourth Circuit's decision in Chaudry. In Maynard v. Cannon,[19] the court held that § 1692g was "not intended to give a debtor a detailed accounting of debt to be collected."[20] In that case, the court held that the creditor complied with § 1692g by naming the original creditor, correctly identifying the amount of the debt, and not engaging in communication with the debtor after the letter.[21] The same result is warranted here.

After Plaintiff disputed the debt and requested verification, Afni sent Plaintiff the March 18, 2009 letter. The March 18, 2009 letter confirmed that the account was in Plaintiff's name, that the name of the creditor was T-Mobile, provided the address of the original creditor, the balance due, the nature of the debt, and the dates of service from which the balance arose. No further collection efforts were made. [*9] The Court finds that, under these circumstances, Afni complied with the requirements of § 1692g.

Plaintiff argues that Afni was required to do more than it did after he disputed the debt. Plaintiff argues that merely "parroting" the information provided by T-Mobile was insufficient. In support, Plaintiff cites a number of cases decided under the Fair Credit Reporting Act, which is not at issue here. Therefore, the Court finds these cases to be inapplicable here.

Plaintiff also argues that Afni should have done more because it was put on notice that this was a case of identity theft. However, that position is not supported by the letter he sent disputing the debt. While Plaintiff stated that he did not

---

[14] See, e.g., Freyermuth v. Credit Bureau Servs., Inc., 248 F.3d 767, 771 (8th Cir. 2001) (holding "that, in the absence of a threat of litigation or actual litigation, no violation of the FDCPA has occurred when a debt collector attempts to collect on a potentially time-barred debt that is otherwise valid"); see also Goins v. JBC & Assocs, P.C. 352 F.Supp.2d 262, 272 (D.Conn. 2005) [*7] (holding that a debt collector may seek to collect on a time-barred debt but may not threaten litigation if such suit would be improper).

[15] 15 U.S.C. § 1692g(b).

[16] Chaudhry v. Gallerizzo, 174 F.3d 394, 406 (4th Cir. 1999).

[17] Id.

[18] Clark v. Capital Credit & Collection Servs., Inc., 460 F.3d 1162, 1174 (9th Cir. 2006).

[19] 401 Fed. Appx. 389, 2010 U.S. App. LEXIS 23308, 2010 WL 4487113 (10th Cir. Nov. 10, 2010).

[20] 2010 U.S. App. LEXIS 23308, [WL] at *6.

[21] 2010 U.S. App. LEXIS 23308, [WL] at *7.

ELIZABETH CALDCLEUGH

have an account with T-Mobile and had not used its services, there is nothing in his letter which would indicate that he was the victim of identity theft. As a result, there was no reason for Afni to determine whether this was a case of identity theft.

Plaintiff also argues that Afni unlawfully continued its collection efforts without verifying the debt. This claim fails because: (1) Afni did verify the debt; and (2) Afni did not continue with collection efforts after providing Plaintiff [*10] the verification. For these reasons, the Court finds that Afni is entitled to summary judgment on this claim.

## C. UCSPA

Plaintiff also argues that Afni's actions also violated the UCSPA. Specifically, Plaintiff argues that Afni violated the UCSPA by "charg[ing] a consumer for a consumer transaction that has not previously been agreed to by the consumer."[22] However, Afni has not "charged" Plaintiff anything. Rather, Afni is attempting to collect a debt that was owing to T-Mobile. Thus, it was T-Mobile that actually charged Plaintiff, not Afni.

Plaintiff further argues that Afni violated the UCSPA by attempting to collect on a debt barred by the statute of limitations. Plaintiff, however, fails to point to any provision of the UCSPA or any case law to support this claim. Nor is there any evidence to show that any alleged violation of the UCSPA was done with the requisite intent.[23] There is nothing to suggest that Afni knowingly and intentionally sought to deceive Plaintiff. Therefore, Plaintiff's claims under the UCSPA fail.

## IV. [*11] CONCLUSION

It is therefore

ORDERED that Defendants' Motion for Summary Judgment (Docket No. 20) is GRANTED. It is further

ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 22) is DENIED.

The Clerk of the Court is directed to enter judgment in favor of Defendants and against Plaintiff and close this case forthwith.

DATED January 13, 2011.

BY THE COURT:

/s/ Ted Stewart

TED STEWART

United States District Judge

---

[22] Utah Code Ann. § 13-11-4(2)(r).

[23] *See id.* § 13-11-4(2) (stating that a supplier commits a deceptive act or practice if the supplier acts knowingly or intentionally).

ELIZABETH CALDCLEUGH



Thomas Schaefer, Plaintiff, v. ARM Receivable Management, Inc., Asset Acceptance, LLC, and Northland Group, Inc., Defendants.

Civil Action No. 09-11666-DJC

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2011 U.S. Dist. LEXIS 77828

July 19, 2011, Decided

COUNSEL: [*1] For Thomas Schaefer, Plaintiff: Angela K. Troccoli, LEAD ATTORNEY, Kimmel & Silverman, PC, Dayville, CT; Craig Thor Kimmel, LEAD ATTORNEY, Amy L. Bennecoff, Kimmel & Silverman, P.C., Ambler, PA.

For Arm Receiveable Management, Inc., Asset Acceptance, LLC, Northland Group, Inc., Defendants: Steven S. Broadley, Posternak, Blankstein & Lund, Boston, MA.

JUDGES: Denise J. Casper, United States District Judge.

OPINION BY: Denise J. Casper

OPINION

## MEMORANDUM AND ORDER

Casper, J.

## I. Introduction

Plaintiff Thomas Schaefer ("Schaefer") brought this action alleging numerous violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA") against Defendants Accounts Receivable Management, Inc. ("ARM"), Asset Acceptance, LLC, ("Asset") and Northland Group, Inc. ("Northland") (collectively, "Defendants"). Defendants now move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Rule") 12(c), or alternatively, for summary judgment pursuant to Rule 56. For the reasons stated below, Defendants' motion for judgment on the pleadings is GRANTED.

## II. Burden of Proof and Standard of Review

Pursuant to Rule 12(c), a party may move for judgment on the pleadings. "A motion for judgment on the pleadings [*2] is treated much like a Rule 12(b)(6) motion to dismiss." Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (citing Curran v. Cousins, 509 F.3d 36, 43-44 (1st Cir. 2007)). When considering a motion under Rule 12(c), a court must view the facts in the pleadings and the reasonable inferences therefrom in the light most favorable to the nonmovant. Perez-Acevedo, 520 F.3d at 29 (citation omitted). In reviewing the motion, the Court may also "consider 'documents the authenticity of which are not disputed by the parties; . . . documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint." Curran, 509 F.3d at 44 (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)). In order to survive a Rule 12(c) motion, "a complaint must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true. . . .'" Perez-Acevedo, 520 F.3d at 29 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "[A]n adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).

## III. [*3] Factual Background

Schaefer incurred a debt owed to Providian Financial. (Am. Compl. ¶¶11, 13; Exs. A, B). ¹ The debt Schaefer owed to Providian Financial was assigned to Asset. (Am. Compl. ¶ 12, Exs. A, B). ARM and Northland are debt collectors that attempted to collect that debt. (Am. Compl. ¶¶ 11, 13, 14, 15). On June 20, 2009,

Northland mailed Schaefer a letter, stating that a debt of $3,864.09 had been assigned to it for collection. (Am. Compl. ¶¶ 11, 15; Ex. A, 6/20/09 Letter). The June 20, 2009 letter indicated that Asset was the original creditor of the debt. (Am. Compl., Ex. A). It further advised that if Schaefer disputed the validity of the debt, or any portion thereof, by notifying Northland "in writing within 30 days after receiving" the notice, it would "obtain verification of the debt . . . and mail [Schaefer] a copy of such . . . verification." (Am. Compl., Ex. A). The letter stated that if Schaefer requested it within thirty days of receiving the letter, Northland would "provide him with the name and address of the original creditor, if different from the current creditor." (Am. Compl., Ex. A). The June 20, 2009 letter also offered to settle the debt for $1,661.56, approximately [*4] a 43% discount of the total amount due. (Am. Compl., Ex. A).

> 1   For the purposes of this Memorandum and Order, all references to the parties' filings are abbreviated as follows: Schaefer's amended complaint ("Am. Compl."); Defendants' second memorandum of law in support of their motion for judgment on the pleadings or alternatively, for summary judgment ("Def. Memo."); Schaefer's opposition ("Pl. Opp."); and Transcript of motion hearing on June 17, 2011 ("Tr. 6/17/11").

A few months later, on September 9, 2009, ARM mailed a letter to Schaefer, stating he owed a debt of $3,904.97. (Am. Compl. ¶¶ 13, 15; Ex. B, 9/9/09 Letter). The debt had increased by $40.88 from the June 20, 2009 letter from Northland. The September 9, 2009 letter indicated that Asset was the creditor and that Providian Financial was the original creditor. (Am. Compl., Ex. B). The letter also offered to settle Schaefer's debt for $1,561.99. (Am. Compl., Ex. B). It further advised that if Schaefer disputed the validity of the debt, or any portion thereof, by notifying "in writing within 30 days after receiving" the notice, it would "obtain verification of the debt . . . and mail [Schaefer] a copy of such . . . verification." [*5] (Am. Compl., Ex. B). The letter stated that if Schaefer requested it within thirty days of receiving the letter, ARM would "provide him with the name and address of the original creditor, if different from the current creditor." (Am. Compl., Ex. B).

**IV. Procedural History**

Schaefer filed a complaint on October 5, 2009 and subsequently filed a one-count amended complaint on November 5, 2009, alleging Defendants' collection letters violated 15 U.S.C. §§ 1692e(2), 1692e(10), 1692f and 1692f(1) of the FDCPA. (Dkt. 1, 8). Discovery having been completed in this case (Tr. 6/17/11 at 12), Defendants have now moved for judgment on the pleadings

under Rule 12(c), or alternatively, for summary judgment under Rule 56. [2] This matter was transferred to this session on February 3, 2011. This Court heard oral argument on the motion on June 17, 2011. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

> 2   The Court treats this motion as a Rule 12(c) motion for judgment on the pleadings, rather than a Rule 56 motion for summary judgment since the parties neither present nor rely on any additional materials beyond the amended complaint and its exhibits. See Gulf Coast Bank & Trust Co. v. Reder, 355 F.3d 35, 38 (1st Cir. 2004). [*6] The Court also notes that Defendants did not file a statement of material facts as required under Local Rule 56.1 when filing a motion for summary judgment.

**V. Discussion**

**A. The FDCPA**

The FDCPA was "enacted to protect debtors from abusive debt collection practices." Chiang v. Verizon New England Inc., 595 F.3d 26, 41 (1st Cir. 2010); see also 15 U.S.C. § 1692-1692f. To further this purpose, the FDCPA grants a private right of action to consumers who receive communications that violates the Act. 15 U.S.C. § 1692k. It prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt" and from using "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. §§ 1692e-1692f.

The question of whether a collection letter violates the provisions of the FDCPA is a question of law to be determined by the Court. See Chiang, 595 F.3d at 34. When evaluating whether a collection letter or notice violates the FDCPA, "courts usually look to whether the objective 'least sophisticated consumer' would find the notice improperly threatening or misleading." Martin v. Sands, 62 F. Supp. 2d 196, 199 (D. Mass. 1999) [*7] (citing Clomon v. Jackson, 988 F.2d 1314, 1318 (2d Cir. 1993)); see Waters v. Kream, 770 F. Supp. 2d 434, 2011 WL 899361, at *2 (D. Mass. Mar. 16, 2011) (quoting Ellis v. Solomon & Solomon, P.C., 591 F.3d 130, 135 (2d Cir. 2010)). This standard, while protecting naive consumers, "also 'prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care.'" Wilson v. Quadramed Corp., 225 F.3d 350, 354-55 (3d Cir. 2000) (quoting United States v. Nat'l Fin. Servs., Inc., 98 F.3d 131, 136 (4th Cir. 1996)). "The basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers,

the gullible as well as the shrewd." Clomon, 988 F.2d at 1318.

Schaefer's amended complaint asserts that the Defendants' collection letters violated the FDCPA on the grounds that: i) they each falsely represented the character, amount or legal status of the alleged debt in violation of 15 U.S.C. § 1692e(2); ii) they used false representation or deceptive means to collect the debt in violation of 15 U.S.C. § 1692e(10); iii) they used unfair [*8] and deceptive means to collect a debt in violation of 15 U.S.C. § 1692f; and iv) they added fees, charges and expenses not expressly authorized by an agreement in violation of 15 U.S.C. § 1692f(1). (Am. Compl. ¶26a-d). Even reading the amended complaint in the light most favorable to Schaefer, Defendants are entitled to judgment on the pleadings.

## B. Northland and ARM's Attempt to Collect Schaefer's Time-Barred Debt Was Permissible Under the FDCPA

The FDCPA prohibits a debt collector from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt," 15 U.S.C. § 1692e, including falsely representing "the character, amount, or legal status of any debt," id. § 1692e(2)(A). The FDCPA also prohibits debt collectors from using unfair or unconscionable means of collecting a debt. Id. § 1692f. Schaefer makes two arguments regarding Northland and ARM's attempt to collect on the time-barred debt. First, he argues that because his alleged debt was over six years old, it was barred from judicial enforcement by the statute of limitations and thus, ARM and Northland's attempt to collect it without disclosing the debt was time-barred, misrepresented [*9] the legal status of the debt in violation of § 1692e(2). Schaefer also contends that by seeking payment on the debt and offering to settle the debt, Northland and ARM sought to revive the time-barred debt which constituted an "unfair and unconscionable collection tactic" under § 1692f and a "misrepresent[ation] of the legal status of the debt" under § 1692e(2). (Pl. Opp. at 5-9, 13-15).

Schaefer cannot recover under either § 1692f or § 1692e(2) on the basis of the respective attempts of Northland and ARM to collect on his time-barred debt. As an initial matter, although the First Circuit has yet to address the issue, a number of courts that have addressed it have held that a debt is not extinguished because the statute of limitations expires; rather, the statute of limitations merely precludes judicial enforcement to collect on the debt. See, e.g., Huertas v. Galaxy Asset Management, 641 F.3d 28, 32-33 (3d Cir. 2011); Freyermuth v. Credit Bureau Servs., Inc., 248 F.3d 767, 771 (8th Cir. 2001) (holding that "in the absence of a threat of litigation or actual litigation, no violation of the FDCPA has occurred when a debt collector attempts to collect on a potentially time-barred debt [*10] that is otherwise valid"); Dawe v. Capital One Bank, 456 F. Supp. 2d 236, 242 (D. Mass. 2006) (citing Freyermuth and concluding that although the state court's dismissal deprived defendant of a judicial mechanism to recover the loan, such dismissal does not erase the plaintiff's underlying indebtedness to the defendant); Shorty v. Capital One Bank, 90 F. Supp. 2d 1330, 1331-33 (D.N.M. 2000) (finding that sending a debt validation notice regarding a time-barred debt, without notifying that the debt was in fact time-barred, did not violate the FDCPA). "The FDCPA permits a debt collector to seek voluntary repayment of the time-barred debt so long as the debt collector does not initiate or threaten legal action in connection with its debt collection efforts." Huertas, 641 F.3d at 32-33 (citing cases).

Here, Schaefer does not allege in his pleading that Northland or ARM attempted or threatened to commence legal action to recover the debt. Even the least sophisticated consumer would not understand Northland or ARM's respective letters to explicitly or implicitly threaten litigation. ARM's September 9, 2009 letter states in bold letters, **"This is an attempt to collect a debt. . . ."** (Am. Compl., [*11] Ex. B) (emphasis in original). Northland's June 20, 2009 letter states at the outset that Asset, as creditor, assigned Schaefer's account to Northland "for collection." (Am. Compl., Ex. A). The letters both advised that if Schaefer did not dispute the debt within thirty days of receiving the letter, they would assume the debt was valid. (Am. Compl., Exs. A, B). The amended complaint does not allege that Schaefer ever disputed the debt in this time frame.[3] Each letter further proposed a settlement offer at an amount far below Schaefer's debt. (Am. Compl., Exs. A, B).

> 3   In his amended complaint, Schaefer claims to dispute the debt (Am. Compl. ¶¶11,12) yet alleges no facts to support that claim either in his amended complaint or his opposition to the motion to dismiss. Even assuming that this allegation was sufficiently pled and accepting this allegation as true for the purposes of this motion, it is not alleged that Schaefer contacted Northland or ARM to dispute the debt within the thirty-day period as set forth in the collection letters or any time until the instant action. Accordingly, Schaefer cannot now claim a violation of the FDCPA by Northland and ARM's attempt "to collect a previously [*12] undisputed account." Richmond v. Higgins, 435 F.3d 825, 829 (8th Cir. 2006) (finding no FDCPA violation where defendant's attempts were to collect a previously undisputed debt amount); see 15 U.S.C. § 1692g(a)-(c). That is, the defendants were "permitted under the FDCPA to assume that the debt

was valid" at the time that they engaged in their collection attempts. Higgins, 435 F.3d at 829.

Indeed, the Court finds the reasoning of Freyermuth and its progeny persuasive. The letters sent to Schaefer sought no more than voluntary partial repayment of a pre-existing debt. Provided that a debt collector does no more than this in regard to a time-barred debt (and does not threaten litigation if the debtor does not comply with the request), the debtor is not being mislead about the status of the debt. 15 U.S.C. § 1692e(11) requires that Northland and ARM state in their respective collection letters that they were attempting to collect a debt. 15 U.S.C. § 1692e(11). "Since it is appropriate for a debt collector to seek voluntary repayment of a time-barred debt, see Freyermuth, 248 F.3d at 771, it would be unfair if debt collectors were found to violate the FDCPA both if they include [*13] the mandated language [under §1692e(11)] (because inclusion would threaten suit) and if they do not (because failure to include a mandatory notice violates the statute)." Huertas, 641 F.3d at 33.

In addition, Schaefer cites no authority that stands for his proposition that a debt collector is required under the FDCPA to disclose that submitting a payment would revive or toll the statute of limitations. Thus, Schaefer has not stated a plausible claim for a violation of either § 1692e(2) or § 1692f based upon Northland or ARM's respective letters to collect on his debt. See Walker v . Cash Flow Consultants, Inc., 200 F.R.D. 613, 615-16 (N.D. Ill. 2001) (following Freyermuth and dismissing complaint that did not allege that debt collector implicitly or explicitly threatened litigation and that was based solely on the fact that debt collector sent collection letter after limitations period expired). Accordingly, the Court finds that Defendants have shown that they are entitled to judgment in their favor insofar as the complaint alleges violations of the FDCPA based on ARM and Northland's attempts to collect on an allegedly time-barred debt.

### C. Failing to Disclose Potential Tax Consequences [*14] to Schaefer Did Not Constitute a Violation of 15 U.S.C. § 1692e(10) and § 1692f

Schaefer also argues that Northland and ARM violated §§ 1692e(1) and 1692(f) of the FDCPA by failing to advise him of the tax consequences of accepting a discount of his debt if he agreed to settle it. (Pl. Opp. 9-12). [4] Schaefer claims that such failure was "deceptive" under § 1692e(10) and amounted to an "unfair or unconscionable collection tactic" under § 1692f. (Pl. Opp. at 10, 12, 13-15).

4 Schaefer refers to the requirement under 26 U.S.C. § 6050P of the Internal Revenue Code that any amount forgiven in excess of $600 must be reported as income on his federal tax return. (Pl. Opp. 9-12).

Northland and ARM had no affirmative duty to advise Schaefer of potential tax consequences if he accepted their settlement offers. The language of the FDCPA does not require a debt collector to make any affirmative disclosures of potential tax consequences when collecting a debt. See Landes v. Cavalry Portfolio Servs., LLC, 774 F. Supp. 2d 800, 2011 WL 1206157, at *2-3 (finding no FDCPA violation where collection letter mentioned "tax season savings" but did not indicate specific tax consequences of accepting a debt discount). [*15] Schaefer cites no authority that imposes such a requirement and requiring, as a matter of law, debt collectors to inform a debtor of such a potential collateral consequence of settling a pre-existing debt seems far afield from even the broad mandate of FDCPA to protect debtors from abusive debt collection practices. Accordingly, Schaefer has not stated a plausible claim under either § 1692f or §1692e(10) due to Northland and ARM's failure to disclose potential tax consequences in their collection letters. Defendants are therefore entitled to judgment in their favor with respect to these claims. [5]

5 In his opposition to Defendants' motion, Schaefer argues that Northland's June 20, 2009 letter violated § 1692e(10) on three additional grounds: i) by stating that the creditor of Schaefer's account was Asset, when Asset was in fact the debt buyer and Providian Financial was the original creditor; ii) by listing "Providian Financial" next to "Store Name" when Providian Financial "was not a store, but rather a bank and the original creditor"; and iii) by claiming that it had been assigned Schaefer's collection account "which was misleading and deceptive to Plaintiff as the term 'assigned' has [*16] the commonly understood meaning []as having been purchased, when in fact [Northland] did not own the debt, but instead had been hired to the collect the debt." (Pl. Opp. at 11). Even if the amended complaint could be construed to allege a factual basis for these claims, Schaefer provides not a single case, nor could the Court find any authority, to support his assertion that as a matter of law, any one of the above allegations constitute a violation of § 1692e(10) as a false or deceptive attempt to collect a debt. Thus, Schaefer has not stated a plausible claim under § 1692e(10) on these grounds.

### D. Failing to Inform Schaefer that the Debt Would Increase Over Time Did Not Amount to a Violation of 15 U.S.C. § 1692e(2)

Schaefer also claims that both collection letters "falsely represented the character and amount of the debt," violating both 15 U.S.C. §1692e(2), because they failed to state that the balance "would increase on a monthly basis as a result of interest accrued and late charges." (Pl. Opp. at 5-9). The Court disagrees.

The FDCPA requires that a collection letter state "the amount of the debt" that the debt collector is trying to collect. 15 U.S.C. § 1692g(a)(1). The language [*17] of the FDCPA does not require that a debt collection letter advise that the consumer's debt may increase. When stating the amount of the debt, debt collectors cannot "add[ ] language that may overshadow or contradict other language informing the consumer of her rights." Pifko v. CCB Credit Servs., Inc., No. 09-3057, 2010 U.S. Dist. LEXIS 69872, 2010 WL 2771832, at *3 (E.D.N.Y. July 7, 2010) (citing Russell v. Equifax, 74 F.3d 30, 33 (2d Cir. 1996)). A number of courts have held that adding language about further increases and charges in debt collection letters misleads consumers about the amount they owe. See, e.g., Chuway v. Nat'l Action Fin. Servs., 362 F.3d 944, 947 (7th Cir. 2004) (holding that collection letter was unclear as to the amount of debt due, as it stated the current balance but also listed a telephone number for consumer to call to obtain her most current balance information); Kolganov v. Phillips & Cohen Assocs., Ltd., No. 02-3710, 2004 U.S. Dist. LEXIS 7069, 2004 WL 958028, at *3 (E.D.N.Y. Apr. 8, 2004) (holding that defendant violated § 1692(g) where collection letter did not clearly specify the amount owed and included additional language to call a reference number to obtain the latest information about on-going charges [*18] that were increasing the debt). Here, the amount Northland and ARM sought on the date the letters were sent was clearly conveyed. Northland's June 20, 2009 letter indicated the "Current Balance Due" was $3864.09 and ARM's September 9, 2009 letter stated that the "Total Due" was $3,904.97. The letters include no further language stating that additional charges may apply that could confuse or mislead the least sophisticated consumer. Under these circumstances, there is nothing confusing or misleading about the increased amount of debt in the September 9, 2009 letter "as even the most unsophisticated consumer would understand that credit card debt accrues interest." Weiss v. Zwicker & Assocs., P.C., 664 F. Supp. 2d 214, 217 (E.D.N.Y. 2009).

To the extent Schaefer relies on Dragon v. I.C. Sys., Inc., 483 F. Supp. 2d 198 (D. Conn. 2007) for the proposition that Northland and ARM falsely represented the character and amount of the debt in violation of § 1692e(2) of the FDCPA, it is inapposite. In Dragon, the court determined that the defendant debt collector violated § 1692g(a)(1) by failing to provide certain information with respect to interest that had accrued on the plaintiff's outstanding [*19] debt. 483 F. Supp. 2d at 203. There, the defendant had sent the plaintiff a letter listing the "Principal Owed: $136.64" and "BALANCE DUE: $136.64." Id. at 202. The letter did not indicate the date on which payment of the stated balance would suffice to pay the debt in full or state that the amount necessary to fully pay the debt could vary as a result of continually accruing interest, and other fees and charges. Id. at 203. The Court found that this was potentially misleading and thus violated § 1692g(a)(1) because the least sophisticated debtor "could readily conclude that the total amount stated as due ($136.64) was due *at any time*, when in fact, it was not and was subject to adjustment by [the creditor] on a periodic basis." Id. (emphasis in original). Here, however, the letters do not represent that the principal owed and that the balance due are one in the same. This distinction is critical because the least sophisticated consumer in a case like Dragon, may believe that no interest was accruing on the balance due since the same amount was listed for both the principal owed and balance due. Such is not the case here where there is no similar or additional statement that could [*20] be interpreted as misleading or deceptive. Accordingly, Northland and ARM's collection letters do not violate 15 U.S.C. § 1692e(2) and, as a result, are entitled to judgment on the pleadings on this claim. [6]

> 6 Since the Court finds that Schaefer's claims against Northland and ARM fail to state a plausible claim under the FDCPA, his claims against Asset, the party Schaefer contends is vicariously liable for their alleged acts, also fail.

### E. Northland and ARM Did Not Violate 15 U.S.C. § 1692f(1)

Schaefer argues that the amount sought by both Northland and ARM was not authorized by "the agreement creating the debt or permitted by law." (Pl. Opp. at 15, 16). Schaefer fails to allege in the amended complaint a single fact to support this allegation. A wholly conclusory allegation such as this does not comprise a plausible claim under § 1692f(1). See Twombly, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, Northland and ARM are entitled to judgment on the pleadings on this basis as well.

### VI. Conclusion

For the foregoing [*21] reasons, Defendants' motion for judgment on the pleadings is GRANTED.

**So ordered.**

2011 U.S. Dist. LEXIS 77828, *

/s/ Denise J. Casper                    United States District Judge